418 Pa. Superior Ct. 510 (1992)
614 A.2d 754
Michael MAURER, Alfred Maurer and Judith Maurer
v.
The TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA; Thomas A. Gennarelli, M.D.; Ralph T. Geer, M.D.; Ethan R. Colton, M.D.; Rob Roy MacGregor, M.D.; and R. Claude Rogers, M.D.
Appeal of the TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, Dr. Thomas A. Gennarelli, and Dr. R. Claude Rogers.
Michael MAURER, Alfred Maurer and Judith Maurer, Appellants,
v.
The TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, t/a Hospital of the University of Pennsylvania; and Thomas A. Gennarelli, t/a Neurological Associates; and Ralph T. Geer, t/a Hospital of the University of Pennsylvania Intensive Care Associates; and Ethan R. Colton, t/a Hospital of the University of Pennsylvania Intensive Care Associates; and Rob Roy MacGregor, t/a University of Pennsylvania Medical Group Clinical Practice of the University of Pennsylvania; and R. Claude Rogers, t/a Physical Medicine and Rehabilitation Clinical Practice of the University of Pennsylvania.
Superior Court of Pennsylvania.
Argued June 1, 1992.
Filed September 25, 1992.
*513 James J. McCabe, Jr., and Elise E. Singer, Philadelphia, for Trustees of University of Pennsylvania, Gennarelli and Rogers.
Lewis M. Levin, Philadelphia, for Maurer.
Before ROWLEY, President Judge, and WIEAND, CIRILLO, OLSZEWSKI, MONTEMURO, POPOVICH, JOHNSON, HUDOCK and FORD ELLIOTT, JJ.
ROWLEY, President Judge.
On or about December 10, 1980, seventeen-year-old Michael Maurer suffered a severe brain injury when he was struck by a car while walking across a street in Westville, New Jersey. Michael was initially taken to a hospital in New Jersey. However, as he was comatose and in need of specialized care, he was flown by helicopter to the Hospital of the University of Pennsylvania ("HUP"). Michael remained in a coma until January 30, 1981, when he began to show signs of awakening. On February 24, 1981, he appeared able to respond to questions. Michael remained at HUP until May 11, 1981.
While at HUP, Michael was treated by Dr. Thomas A. Gennarelli, a neurosurgeon. During his stay at HUP, Michael's elbows and hips became permanently flexed from heterotopic ossification. Heterotopic ossification begins when layers of bone-like cells grow around a patient's joints. Calcium is then deposited in the bone-like cells, where it eventually hardens into solid bone. Once the hardening occurs, the joints become permanently "flexed" and the patient is unable to move them. Heterotopic ossification commonly afflicts persons who have suffered an interruption of nerve impulses of the central nervous system. Michael also developed a decubitis ulcer, commonly known as a bedsore.
On December 3, 1982, Michael and his parents, all of whom are appellees in the instant case, instituted a cause of action alleging medical malpractice against the Trustees of the University of Pennsylvania (i.e., HUP), Thomas A. Gennarelli, M.D., Ralph T. Geer, M.D., Ethan T. Colton, M.D., Rob Roy *514 MacGregor, M.D., and R. Claude Rogers, M.D. The Maurers contended that the defendants were negligent in 1) failing to administer the drug Didronel; 2) failing to provide physical therapy for Michael; and 3) failing to turn Michael more frequently. The Maurers contended that if Dr. Gennarelli had administered Didronel to Michael, the drug would have prevented calcium from forming on the bone-like deposits and, thus, his joints would not have become flexed. The Maurers also contended that, had Michael received physical therapy more frequently, his joints would not have flexed to such a great degree. Dr. Rogers was the specialist in charge of physical therapy. Finally, the Maurers contended that, had Michael been turned more often, he would not have developed the decubitis ulcer which eventually required surgery. Prior to trial, the parties entered into a stipulation that all claims against Drs. Geer, Colton, and MacGregor were dismissed without prejudice. The remaining defendants are appellants herein.
Following trial, the jury found the remaining defendants to have been negligent in the following proportions: Dr. Gennarelli, 25%; Dr. Rogers, 25%; and HUP, 50%. The verdict sheet also indicated that there had been negligent conduct in the treatment of the heterotopic ossification and the decubitis ulcer and that the ulcer had been caused by negligent conduct. The jury awarded damages of $3,416,470.00 to Michael Maurer based on the negligent treatment of the heterotopic ossification and $6,645.00 to Mr. and Mrs. Maurer as a result of the decubitis ulcer. The defendants' motion for post-trial relief was denied by the trial court in an order entered July 24, 1989. In an order entered April 17, 1990, the trial court molded the verdicts to include delay damages pursuant to Pa.R.C.P. 238 and post-judgment interest at the rate of 6%, and directed that judgment be entered in favor of the plaintiffs and against the defendants in the amount of $5,761,781.60 for Michael Maurer and $11,206.61 for his parents. From the judgment subsequently entered, the defendants filed a timely appeal and the plaintiffs a cross-appeal.
*515 In their appeal, docketed in this Court at No. 1593 Philadelphia 1990, appellants raise three issues: 1) whether appellees established with sufficient medical certainty that appellants' failure to administer Didronel deviated from the standard of care; 2) whether appellees presented competent expert testimony to establish the standard of care with respect to the administration of physiotherapy; and 3) whether the award of delay damages under amended Rule 238 was proper given that delay damages were awarded for the period during which appellants had not yet received sufficient information to make a meaningful evaluation of appellees' case. In their cross-appeal, docketed at No. 1594 Philadelphia 1990, appellees contend that the trial court erred in failing to award post-verdict interest 1) on the portions of the molded verdicts representing damages for delay, and 2) up to entry of final judgment. Because of the importance of the issues raised by the parties, the case was certified for consideration by the Court en banc.

APPEAL AT NO. 1593 PHILADELPHIA 1990

I. Failure to Administer Didronel
Appellants' first issue concerns the failure to administer Didronel, a drug which, according to appellees, would have interrupted the process of heterotopic ossification by preventing the deposit of calcium around Michael's joints. Appellants contend that the testimony of Dr. Thomas James Dillon, appellees' sole expert witness, was insufficient to establish that appellants' failure to administer Didronel violated the accepted standard of care. According to appellants, Dr. Dillon testified only to his own, personal standard of care; he testified that in fact it was not the standard to administer Didronel to brain-injured patients in 1980 and 1981; and he contradicted his own testimony concerning the administration of Didronel during the period in question. Appellants also point to evidence, acknowledged by Dr. Dillon, suggesting that it was not the standard of care to administer Didronel to brain-injured patients such as Michael in 1980 and 1981. They contend that the inadequacy of appellees' expert's testimony entitles them *516 to the award of judgment notwithstanding the verdict, or judgment n.o.v.[1]
When reviewing a request for judgment n.o.v., we consider all of the evidence actually received and all reasonable inferences therefrom in the light most favorable to the verdict winner  in this case, Michael Maurer and his parents. Niles v. Fall Creek Hunting Club, Inc., 376 Pa.Super. 260, 264-65, 545 A.2d 926, 929 (1988). The remedy of judgment n.o.v. is a drastic one, and it will be granted only where no two reasonable persons could fail to agree that the verdict entered in the trial court is improper. Id., 376 Pa.Superior Ct. at 264-65, 545 A.2d at 928-29.
As appellants assert, a plaintiff cannot establish a prima facie case of medical malpractice without, inter alia, presenting an expert witness who will testify, "to a reasonable degree of medical certainty, that the acts of the [defendant] physician deviated from good and acceptable medical standards...." Mitzelfelt v. Kamrin, 526 Pa. 54, 62, 584 A.2d 888, 892 (1990) (emphasis added). Our courts have phrased this requirement in a variety of ways. See, e.g., Brannan v. Lankenau Hospital, 490 Pa. 588, 595, 417 A.2d 196, 199 (1980) (plaintiff must introduce expert testimony to show defendants' conduct varied from "acceptable medical practice"); Strain v. Ferroni, 405 Pa.Super. 349, 357, 592 A.2d 698, 703 (1991) (expert did not suggest defendant physician deviated from "a requisite standard of care"); Lira v. Albert Einstein Medical Center, 384 Pa.Super. 503, 509, 559 A.2d 550, 552 (1989), alloc. denied, 527 Pa. 635, 592 A.2d 1302 (1990) (expert testimony required to establish "standard of reasonable medical care"); Corbett v. Weisband, 380 Pa.Super. 292, 301-2, 551 A.2d 1059, 1064 (1988) (plaintiff must prove by competent evidence that defendant's conduct fell below "standards of reasonable medical practice"); Brophy v. Brizuela, 358 Pa.Super. 400, 405-6, *517 517 A.2d 1293, 1296 (1986) (expert testimony required to establish "standard of care" and deviation therefrom).[2]
In order to evaluate appellants' claims concerning the insufficiency of Dr. Dillon's expert testimony, it is necessary that we review not only the testimony itself but also the standard against which it is to be measured. In Donaldson v. Maffucci, 397 Pa. 548, 156 A.2d 835 (1959), our Supreme Court addressed the concept of "standard of care" as follows:
The standard of care required of a physician or surgeon is well-settled. In the absence of a special contract, a physician or surgeon is neither a warrantor of a cure nor a guarantor of the result of his treatment[.] A physician who is not a specialist is required to possess and employ in the treatment of a patient the skill and knowledge usually possessed by physicians in the same or a similar locality, giving due regard to the advanced state of the profession at the time of the treatment; and in employing the required skill and knowledge he is also required to exercise the care and judgment of a reasonable man. However, a physician or surgeon is not bound to employ any particular mode of treatment of a patient, and, where among physicians or surgeons of ordinary skill and learning more than one method of treatment is recognized as proper, it is not negligence for the physician or the surgeon to adopt either of such methods.
The burden of proof in a malpractice action is upon the plaintiff to prove either (1) that the physician or surgeon did not possess and employ the required skill and knowledge or (2) that he did not exercise the care and judgment of a reasonable man in like circumstances....
Id., 397 Pa. at 553-54, 156 A.2d at 838 (citations omitted; emphasis in original). A specialist acting within his or her specialty, however, is held to a higher standard; he or she "is *518 expected to exercise that degree of skill, learning and care normally possessed and exercised by the average physician who devotes special study and attention to the diagnosis and treatment" of diseases within the specialty. Pratt v. Stein, 298 Pa.Super. 92, 156, 444 A.2d 674, 708 (1982) [quoting McPhee v. Reichel, 461 F.2d 947, 951 (3d Cir.1972)]. The standard of care to be applied to a resident is an intermediate one, higher than that for a general practitioner but less than that for a fully trained specialist. Jistarri v. Nappi, 378 Pa.Super. 583, 591, 549 A.2d 210, 214 (1988).
Our research does not disclose any variation in meaning among the terms "standard of care," "acceptable medical practice," and so on. In fact, when confronted in Incollingo v. Ewing, 444 Pa. 299, 282 A.2d 206 (1971), with the defendant/appellant's claim that plaintiffs/appellees had failed to prove that his conduct did not meet "the accepted standards of the medical profession" of that time and place, the Supreme Court utilized its "standard of care" discussion in Donaldson v. Maffucci, supra, to evaluate and ultimately reject appellant's claim.
As the Supreme Court indicated in Donaldson v. Maffucci, the applicable standard of care may encompass more than one method of treatment; see also Brannan v. Lankenau Hospital, 490 Pa. at 597, 417 A.2d at 200 (jury may not decide which of two respected methods was the better). At the same time, it is not the case "that as long as a course of conduct, however unreasonable by ordinary standards, is the norm for the group, all members of the group are thereby insulated from liability so long as they do not deviate therefrom." Incollingo v. Ewing, 444 Pa. 263, 282, 282 A.2d 206, 217 (1971). To the contrary, a physician is required "to give due regard to the advanced state of the profession and to exercise the care and judgment of a reasonable [person] in the exercise of medical skill and knowledge." Id., 444 Pa. at 283, 282 A.2d at 217.
With this understanding, we turn to Dr. Dillon's testimony. On redirect examination the following exchange took place between Dr. Dillon, counsel for plaintiffs (appellees) and for defendants (appellants), and the trial court:

*519 Plaintiffs: In accordance with acceptable standards of medical practice, and to a reasonable 
Court: You withdrew the last question, I take it? Go ahead.
Plaintiffs: Do you have an opinion, Doctor, as to when Didronel should have been started with this patient?
Defendants: Objection.
Court: Overruled.
Witness: I do.
Plaintiffs: What is that, please?
Witness: When the alkaline phosphatase went up rapidly, when the joints began to tighten and the physical therapist reported this. Those would have been the earliest clinical evidence that it should have been started.
N.T., 10/28/87, at 80-81.
Dr. Dillon was later asked whether, "[i]n accordance with acceptable standards of reasonable medical care, . . . you have an opinion, to a reasonable medical certainty, as to who should have ordered that Didronel medication be given?" (N.T., 10/28/87, at 89). Dr. Dillon replied that the primary attending physician, defendant/appellant Dr. Thomas Gennarelli, should have done so.
When Dr. Dillon was asked "how often, in your opinion, and in what quantities, to a reasonable medical certainty, and again, in accordance with acceptable medical practices, should Didronel have been given," he answered as follows:
As soon as I had an increase in alkaline phosphatase, as soon as I had a fever of undetermined origin, and could not be determined, as soon as I had tightening of the joints, I would have started Didronel on just an empiric basis without the scans. I would have had the scans done, of course; but without the scans, even, I would have started that. It could have done no harm, and I might have prevented the laying down of this very dense bone.
N.T., 10/28/87, at 101. Asked later whether he had an opinion, "to a reasonable medical certainty, based on acceptable standards of medical care, whether the failure to give Didronel *520 beginning at that time increased the risk of Michael Maurer not being able to move his joints ...," Dr. Dillon answered that he had such an opinion and that "I believe it would have markedly diminished the fixation of the heterotopic ossification around those joints ..." (N.T., 10/28/87, at 102-3). Dr. Dillon offered the opinion that if appropriate Didronel therapy had been given, Michael would be able to walk without support.[3] He also declined to dispute defense counsel's interpretation of his testimony as saying that "Dr. Gennarelli blew it, so to speak, by not administering Didronel to Michael Maurer" (N.T., 10/29/87, at 28).
Appellants point to numerous passages which, in their view, indicate that the expert witness's testimony was far less definite than the statements just quoted would indicate. They contend, first, that Dr. Dillon testified only to his own, personal standard of care. As evidence of this, they cite the passage, quoted above, in which Dr. Dillon stated that "As soon as I had an increase in alkaline phosphates, ... I would have started Didronel" (N.T., 10/28/87, at 101; emphasis added). Bearing in mind our scope of review, however, we conclude that it is reasonable to infer from this testimony that despite his use of the first-person pronoun, Dr. Dillon intended his answer to be responsive to the question, which asked for his opinion "in accordance with acceptable medical practice."
More persuasive is appellants' claim that Dr. Dillon's testimony was contradictory and inconsistent with regard to the standard of care. Dr. Dillon's definition of this phrase first became an issue during recross-examination, when the following discussion took place:
Defense Counsel: Now, what I'm trying to establish now is, that at that point in time [when Michael was treated at HUP], it was not the standard of care to administer Didronel to brain injured patients, because it hadn't yet been approved by the Food and Drug Administration for that purpose?
Witness: That's correct.
Defense Counsel: That is true, is it not?

*521 Witness: Yes.
N.T., 10/29/87, at 28. At a later point in the recross-examination, the discussion continued:
Defense Counsel: ... It hadn't yet become the standard of care, had it, as of 1981, the administration routinely of brain injured patients by Didronel [sic]?
Witness: That I don't know.
Plaintiffs' Counsel: Let me object, Your Honor. There may be some confusion here between the way [defense counsel] is using the standard of care, in terms of what are the majority of people using, versus what this witness has been talking about as the standard of care is [sic], what is acceptable medical practice. And this is something that I alluded to before. But I think they are using perhaps the same words and attaching different meanings to them.
The Court: Well, Doctor, do you understand what he means, when he used the phraseology, "standard of care"?
Witness: I don't think I do. Because I think they're switching back and forth between the two. I want to be precise as I was in [my] deposition.
Court: Just answer my question. Do you understand, when he asked you about standard of care, what he means?
Witness: Yes, I think I do.
Court: If he thinks he does, he can answer the question.
Defense Counsel: Well, maybe it would be helpful to tell us what you mean by "the standard of care," so there is no misunderstanding as to what you mean when you answer a question, which I asked you in which I use "the standard of care." What do you mean?
Witness: It would be that care which would be universally used by the medical community in treating patients with similar signs and symptoms, diagnoses.
Defense Counsel: It does relate to what other people were doing, then, does it?
Witness: Yes.
Plaintiffs' Counsel: Objection, Your Honor. That is not quite what the legal standard is.

*522 Court: Wait. He has given his definition. And I believe at this point we have to utilize his definition. We can talk about the legal standard later on. But this is the definition he just gave.
Plaintiffs' Counsel: Fair enough, Your Honor.
N.T., 10/29/87, at 30-32.
After reviewing these excerpts, we conclude that when Dr. Dillon stated that the routine administration of Didronel was not the standard of care at the time in question, he meant only that Didronel was not "universally used" with patients such as Michael. Such a statement, by itself, is not fatal to plaintiffs/appellees' case, since, as indicated by the case law discussed above, "standard of care" is not to be equated with "universal use." However, while we learn from the testimony just quoted that the routine administration of Didronel was not the "standard of care" as defined by Dr. Dillon (i.e., "universal use"), this testimony does not indicate whether the routine administration was the standard of care as that phrase is defined in case law.
At a later point in the recross-examination, Dr. Dillon's understanding of the phrase "acceptable medical standards" became an issue:
Defense Counsel: Earlier  I guess it was yesterday you were interpreting some terminology that Mr. Tunstall was using in his questions. One of the phrases that he was using was "acceptable medical standards." Do you remember his using that expression?
Witness: Yes, I do.
Defense Counsel: Would you tell us what you mean by the expression "acceptable medical standards"?
Witness: That would be beyond derogatory criticism by your peers.
Defense Counsel: Can you explain that a little more fully?
Witness: Well, everybody could have a difference of opinion about it, but  and they could accept that everybody has a little different opinion. But you could be so far in your standard deviation from care of the patient, that you would *523 be criticized by your colleagues either formally or informally; and that would be beyond the acceptable standard of care in a negative way.
Defense Counsel: In answering [plaintiffs' counsel's] question, was that the meaning that you had in mind of that expression as you were answering his questions?
Witness: No. I felt this was the way that they had to phrase a question to be in keeping with the Judge and whatever they present, things likes [sic] medical probability and those types of things.
Defense Counsel: That comes from your extensive experience, doesn't it? Doctor, let's put that aside, and go back again.
Plaintiffs' Counsel: Let him answer the question.
Court: Which question, the last one about coming from his experience?
Plaintiffs' Counsel: Right. About whether he knows the meaning  the legal meaning or whatever of "acceptable medical standards."
Court: Okay. You may answer.
Witness: I thought that was just the way the counselor would address the question, whatever way they have to preface it in order to have it accepted by  without objection or by the Bench, by the Bar.
Plaintiffs' Counsel: The question was that he asked you: What was your experience with that in the past.
Defense Counsel: That's not what I asked him.
Court: That wasn't quite the question.
Defense Counsel: May I withdraw it?
Court: You may withdraw it.
N.T., 10/29/87, at 105-6. At a subsequent point in the recross-examination, an attempt was made to clarify the matter:
Defense Counsel: Doctor, are you suggesting that the precise words used in the question are not very important; that it's the answer that is more significant.
Plaintiffs' Counsel: Objection.
Court: Overruled.

*524 Witness: The question is very important.
Defense Counsel: All right. Then, let me ask you, again: What do you mean by the expression "acceptable medical standards" when you answer a question in which that phrase is used?
Witness: I'm trying to rephrase what I meant.
Plaintiffs' Counsel: I object, Your Honor. This was asked and answered before.
Court: Sustained.
Defense Counsel: Doctor, does acceptable medical standards mean what everybody does?
Witness: No.
Defense Counsel: Can there be a compliance with acceptable medical standards when one physician administers a given drug in a situation; in a different position, wouldn't administer the drug in the same situation?
Plaintiffs' Counsel: I want to object to that question, too, Your Honor. This is too vague; and I think, eventually, it's going to call for a legal conclusion.
Court: Sustained.
N.T., 10/29/87, at 108-9. There was no further discussion on this point.
Thus, Dr. Dillon offered his definition of "acceptable medical standards" (i.e., "beyond derogatory criticism by your peers") but then indicated that he had not had that definition in mind when answering the questions of plaintiffs' counsel. He did not specify the meaning that he understood that phrase to have when answering the questions, except that he did not understand it to mean "what everybody does."
In Mitzelfelt v. Kamrin, supra, as appellees point out, our Supreme Court observed that "[w]e do not require experts to use `the magic words' when testifying." Id. 526 Pa. at 67, 584 A.2d at 894. Although the Supreme Court made this statement in connection with the plaintiff's obligation to prove causation, we assume without deciding that the principle is also applicable to the requirement of proving the standard of care and a deviation therefrom. In addition, it is also the case *525 that a "relatively minor divergence in only a part of [plaintiff's] expert testimony" does not necessarily compromise the expert's testimony on the standard of care issue to such an extent that the issue should be removed from the jury. Brannan v. Lankenau Hospital, 490 Pa. at 597, 417 A.2d at 200. In the present case, however, the problem is not a lack of "magic words" or a "minor divergence" in expert testimony, but rather the absence of any statement by the plaintiffs' sole expert to the effect that Dr. Gennarelli's failure to administer Didronel to Michael Maurer was a deviation from the standard of care or from acceptable medical practices as those and similar terms are defined in the case law of this Commonwealth.
The problem presented by the absence of a definitive statement concerning the standard of care is compounded in this case by numerous facts which suggest that the administration of Didronel to patients such as Michael Maurer may not have been the standard of care at the beginning of 1981. Dr. Dillon, testifying on October 29, 1987, conceded that although the Food and Drug Administration ("FDA") had approved Didronel for the treatment of heterotopic ossification in patients suffering from spinal cord injuries, it had not yet approved the drug for severely brain-injured patients. After agreeing with defense counsel's description of the Physician's Desk Reference ("PDR") as "sort of a Bible of the medical world on what medications may be used for patients in what dosages and under what circumstances" (N.T., 10/29/87, at 22), Dr. Dillon admitted that the PDR listed Didronel as approved for the treatment of three conditions (Padgett's disease, a bone disease of unknown cause; spinal cord injuries; and hip operations), none of which Michael suffered from, and that, in the words of defense counsel, "there was no indication in there for Didronel ... for a condition that Michael Maurer had ..." (N.T., 10/29/87, at 44). Dr. Dillon maintained that there was essentially no difference between a head injury and a spinal cord injury as far as heterotopic ossification was concerned, although he acknowledged that in general terms there are differences between the two types of injuries. He also pointed *526 out that the PDR's entry for Didronel listed no contraindications for use with a seventeen-year-old male.
Dr. Dillon was also questioned concerning the degree of acceptance that the use of Didronel had attained by the time Michael Maurer entered HUP. He asserted that information concerning Didronel "spread like wild fire by [word of] mouth" (N.T., 10/29/91, at 20) after the publication of an article in 1976. He also acknowledged, however, that he knew of no textbook available in 1980 or 1981 which recommended Didronel for use with severely brain-injured patients; that he knew of one article, which he believed had been published in 1981, dealing with the use of Didronel with brain-injured patients; and that he knew of only two institutions that were using Didronel on brain-injured patients prior to 1981. In addition, Dr. Dillon was aware that at the time of trial Dr. Gennarelli and another physician were investigating the use of Didronel with such patients.
It is a general rule, as noted earlier, that "expert testimony is required to establish the standard of reasonable medical care" in a medical malpractice case. Lira v. Albert Einstein Medical Center, 384 Pa.Super. at 509, 559 A.2d at 552. If Dr. Dillon had indicated in his testimony that the use of Didronel with brain-injured patients had moved beyond the experimental arena at the time that Michael Maurer was admitted to HUP, the imprecision with which he defined the terms "standard of care" and "acceptable medical standards" might weigh less heavily in our analysis. Conversely, if Dr. Dillon had testified that the administration of Didronel to patients such as Michael was then the standard of care as that term is legally defined, the factual evidence concerning the relatively limited use of Didronel at that time might be accorded less significance. We are presented, however, with a relative paucity of evidence concerning Didronel's acceptance in the medical community in 1980-81 and the absence of a definitive statement concerning the applicable standard of care.
Therefore, we are constrained to conclude that Dr. Dillon did not testify to anything more than his own, personal standard of care. As plaintiffs/appellees have failed to prove *527 an essential element of their action, namely, a deviation from the standard of care, we grant judgment notwithstanding the verdict to Dr. Gennarelli.

II. Administration of Physiotherapy
Appellants contend that appellees' expert testimony with regard to the administration of physiotherapy under the direction of Dr. Rogers, like their expert testimony with regard to Dr. Gennarelli's treatment of heterotopic ossification, was insufficient. They allege, first, that appellees' expert, Dr. Dillon, failed to establish the applicable standard of care. The gravamen of their argument is not, as with heterotopic ossification, that Dr. Dillon failed to explain what he meant by terms such as "standard of care" and "acceptable medical standards," but rather that he failed to indicate that the standard of care to which he testified would have been generally accepted in 1980-81. The pertinent testimony is as follows:
Plaintiffs' Counsel: ... Do you have an opinion, to a reasonable medical certainty, how, in accordance with acceptable medical standards, range of motion to elbows or hips should be done in a patient who has suffered a severe brain injury?
Defense Counsel: Objection.
Court: Overruled.
Witness: I do.
Plaintiffs' Counsel: What is that opinion?
Defense Counsel: Objection, Your Honor. It's not relevant. It should be directed to this particular patient and not a broad, general 
Court: Overruled.
Witness: I think what you commit yourselves to do in terms of range of motion, you should do it at least three times a day.
Plaintiffs' Counsel: And in this particular patient, what is your opinion?

Witness: Three times a day.

Plaintiffs' Counsel: And how should it be done?

*528 Witness: Very slowly, very carefully, so you don't set off primitive reflexes, so you don't tear any tissue to cause bleeding in those areas where there's beginning contracture.
N.T., 10/28/87, at 97-98 (emphasis added). Bearing in mind the applicable scope of review, we consider it reasonable to infer from the testimony just quoted that Dr. Dillon, having been specifically asked for his opinion with regard to Michael Maurer, was taking into account the "acceptable medical standards" that prevailed when Michael was being treated at HUP.
Appellants also contend that appellees' expert witness failed to establish a deviation from the applicable standard of care. In order to evaluate this claim, we turn to Dr. Dillon's testimony on the subject of physiotherapy. From Dr. Dillon's review of various hospital records we learn the following:
On December 22, 1980, Michael Maurer was examined by Dr. Rogers, the rehabilitation specialist, and range of motion exercises were ordered. There are conflicting statements concerning the initial frequency with which these exercises were performed. The intensive care nursing notes for that date refer to "progressive range of motion to extremities every four hours" (N.T., 10/28/87, at 118); a physical therapist's notes of the same date contain the statement "Will treat this patient with progressive range of motion at least three times [per] week until program can be modified ..." (N.T., 10/29/87, at 173); Dr. Dillon also indicated that the instructions around that time were to maintain range of motion "to the ... arms and hip ..." (N.T., 10/28/87, at 95). Later notes revealed that, in Dr. Dillon's words, "Physical Therapy did range of motion on intermittent days or every third day. It was not consecutive ..." (N.T., 10/28/87, at 97). An "orthopedics consult note" dated on or about February 9, 1981, stated that the patient had "severe myositis ossificans" (apparently an indication of the onset of, or a condition related to, heterotopic ossification) of the shoulders and elbows and that "[f]urther range of motion of these joints will aggravate this" (N.T., 10/28/87, at 86). Dr. Dillon also testified, however, that

*529 [t]he patient was noted on February 19, 1981, to have severe myositis ossificans around both elbows, confirmed by x-rays, and also involving the shoulders. These findings had been noted earlier, and the patient was treated with aggressive physical therapy.

N.T., 10/28/87, at 62 (emphasis added). An entry made on the patient's chart on February 20, 1981, reads as follows: "Discontinue range of motion exercises to elbows and shoulders (as per Ortho) [,] continue ankle range of motion" (N.T., 10/28/87, at 87). Similar notations appear in the patient's hospital record until April 9. Dr. Dillon also read the following from the hospital discharge summary:
During the month of March, the patient continued to spike fevers, off the antibiotics with no clear source. He continued to improve. The orthopedic problem was stable, and with intensive occupational therapy, physical therapy, speech therapy, the patient began to vocalize in response to questions.
N.T., 10/28/87, at 62-63 (emphasis added).
Although the testimony just summarized is not entirely consistent, it is reasonable to infer from the testimony that range of motion exercises may initially have been performed at the rate of once every four hours, but that they were decreased to once every several days and were eventually discontinued, at least with regard to the shoulders and elbows, toward the end of February 1981. This course of treatment is not in accord with the standard of care, as testified to by Dr. Dillon, as to the necessity and recommended frequency of range of motion exercises.
Appellants contend, however, that on cross-examination Dr. Dillon conceded that physiotherapy had to be adapted to the condition of the patient at a particular point in time and that the records on which he had relied in forming his opinion were incomplete. The following exchange is at issue:
Defense Counsel: ... And, therefore, what you do and don't do in physiotherapy they were as [sic] to be adjusted in relation to what's going on with the patient, doesn't it?
Witness: Yes.

*530 Defense Counsel: And it's a fact that the physiotherapy ought to be appropriate to whatever the patient's condition is at a given point in time?
Witness: Yes.
Defense Counsel: And in order to assess the appropriateness of physiotherapy, you need to know  do you  do you not  how the patient was at the given moment of time when the physiotherapy was or wasn't being given?
Witness: Yes.
Defense Counsel: And it's also true, in order to assess the quality of the physiotherapy, to have a precise idea of what the physiotherapist was or wasn't doing; is that right?
Witness: Yes.
Defense Counsel: And you agree, do you not, from your review of the hospital chart or the copies provided to you by Mr. Rubino,[[4]] that you could not form a clear picture of what physiotherapy was or was not being provided from time to time in the case of Michael Maurer?
.....
Witness: I can't answer that as a yes or no. It was my impression 
Defense Counsel: Before you start telling me about your impression  [.] If Your Honor please, I would like to ask the witness another question. If he says he can't answer that one, I'd like to try to clarify it for him.
Plaintiffs' Counsel: Your Honor, he said he couldn't answer it yes or no.
Defense Counsel: I want to ask him why he can't.
Plaintiffs' Counsel: He is going to tell you.
Defense Counsel: He was beginning to answer the question instead of telling me why he could not give give [sic] a yes or no. I want to find out. Maybe I can clarify the question so he can give me a yes or no, if he can tell me what it is about the question that didn't allow him to give 

*531 Witness: The chart was incomplete.
Defense Counsel: Okay. Very good answer. In other words, you would need to know more than what was made available to you?
Witness: Yes.
N.T., 10/29/87, at 75-77. According to appellants, the testimony just quoted reveals that in fact Dr. Dillon was unable to establish that the physiotherapeutic treatment administered to Michael Maurer deviated from the standard of care.
Appellees contend, however, that "Dr. Dillon confirmed that he reviewed and relied upon the very records of physiotherapy which were duly authenticated and admitted into the trial record" (Original Brief for Appellees at 39 n. 11). In support of their argument, appellees point to the following redirect testimony:
Plaintiffs' Counsel: Dr. Dillon, we have a stipulation, part of which reads as follows: "Dr. Rogers is a specialist in Physical Medicine and Rehabilitation and responded on 12/22/1980[[5]] to a request for a consultation." The rest of it reads: "Dr. Gennarelli is a neurosurgeon and was the attending physician throughout the admission." At the end of the first set of handwriting on that consultation there, does the name Rogers appear?
Witness: Yes.
Plaintiffs' Counsel: Does he refer, in his consultation report, to passive range of motion of the extremities?
Witness: Yes, there is a PT, which means Physical Therapy with a circle around it, and range of motion, bedside therapy, number one, passive range of motion, all extremities. Number two, stretching easy  I can't read the next words.
.....
Plaintiffs' Counsel: Under the PT part, is there anything more than that number one you read and number two that you're having problems reading? Is there three or four going on to the next page?

*532 Witness: PT evaluation, I believe that's the words. And the second word is proper positioning wrist, ankles, (splint continuing).
Plaintiffs' Counsel: Is that the end, except for a person named Rogers is signing off?
Witness: Yes.

.....
Plaintiffs' Counsel: Is there another entry that starts still on that page?
Witness: Yes.
Plaintiffs' Counsel: What is that date?
Witness: 12/22/1980[.]
Plaintiffs' Counsel: All right. Now, at the very end of that entry, is there a signature of a person and then some initials?
Witness: Yes.
Plaintiffs' Counsel: What are those initials?
Witness: RPT.
Plaintiffs' Counsel: What does that mean?
Witness: Registered Physical Therapist.
Plaintiffs' Counsel: All right. Start back at the top of that entry. Would you read for the jury, please, the first sentence?
Witness: 17-year-old male 
Plaintiffs' Counsel: I'm sorry. I'm talking about the entry of 12/22/80 now, the one that's by the initials, Physical Therapist?
Witness: "Patient seen initially today, nonresponsive to verbal commands. Range of motion is full and somewhat limited."
.....
Plaintiffs' Counsel: ... Let's skip down to the end of that note. What does the last sentence say?
Witness: "Will treat this patient with progressive range of motion at least three times slash week until program can be modified, as his progress"  I can't read the next word  "allows." That's it.

*533 Plaintiffs' Counsel: The slash, does that mean per, P-E-R?
Witness: Yes.
Plaintiffs' Counsel: Are there still further entries made on that page?
Witness: Yes.
Plaintiffs' Counsel: And continuing onto the next page chronologically.
Defense Counsel: Objection. Your Honor, this is going beyond the scope of my direct examination, I made no reference to this document at all in my cross-examination of this witness.
Plaintiffs' Counsel: Not to the document itself, Your Honor, but Mr. McCabe did make a reference to how things might change over time with physical therapy. And yesterday, in the exhibit over there, P-1A, I couldn't find these physical therapy notes and when I was on the direct examination with this witness. So, I wanted to ask him if this copy here was the records he was referring to.
Court: Well, you can ask him that, but you have him going into the record, reading the records. If you want to ask him that.
.....
Plaintiffs' Counsel: Are these the physical therapy notes, all the rest of these pages you were referring to when I couldn't  for example, requests  find them in that copy, right off the bat?
Witness: This is the information I put in the letter. Is that what you're asking?
Plaintiffs' Counsel: When you referred to what you saw in the record as to whether physical therapy was done and what kind was done, and that sort of thing, is that what you're talking about?
Witness: Yes.
Plaintiffs' Counsel: You're referring to those records there?
Witness: Yes.
N.T., 10/29/87, at 171-75. We conclude from this discussion that after reviewing the material referred to therein, Dr. *534 Dillon was in fact able to ascertain that the physiotherapeutic treatment given to Michael Maurer did not conform to the standard of care. Accordingly, appellants' argument is without merit.
Next, appellants argue that because there existed "two schools of thought" concerning the advisability of continuing physiotherapy after the onset of heterotopic ossification, they cannot be held liable for discontinuing the range of motion exercises. It is the case, as our Supreme Court has recently held, that
[w]here competent medical authority is divided, a physician will not be held responsible if in the exercise of his judgment he followed a course of treatment advocated by a considerable number of recognized and respected professionals in his given area of expertize [sic].
Jones v. Chidester, 531 Pa. 31, 40, 610 A.2d 964, 969 (1992). The Court observed further that
[t]he burden of proving that there are two schools of thought falls to the defendant.... Once the expert states the factual reasons to support his claim that there is a considerable number of professionals who agree with the treatment employed by the defendant, there is sufficient evidence to warrant an instruction to the jury on the two "schools of thought." It then becomes a question for the jury to determine whether they believe that there are two legitimate schools of thought such that the defendant should be insulated from liability.
Id., 531 Pa. at 40-41, 610 A.2d at 969.
In the case before us appellants acknowledge that "[o]rdinarily, the doctrine is submitted to the jury" (Original Brief for Appellants at 35 n. 10) to determine whether two schools of thought exist. They contend, however, that in the present case the issue should not have gone to the jury because the existence of two schools of thought was established by the testimony of Dr. Dillon, the plaintiffs' expert.
Having reviewed Dr. Dillon's testimony, we disagree. The pertinent testimony is as follows:

*535 Defense Counsel: In your deposition [taken on April 20, 1987], at page 108, Doctor, we got into the matter of the relationship between range of motion therapy and heterotopic ossification.... At line 19, you gave an answer that indicated that physiotherapy wouldn't change the course of heterotopic ossification; is that the thrust of what you were telling us?
Witness: Correct.
Defense Counsel: And then at line 24, I asked you the following question, did I not: "Have you heard that some view [sic] that heterotopic ossification can be increased or aggravated by range of motion?"
Plaintiffs' Counsel: Objection to the question, Your Honor. It calls for hearsay.
Court: Overruled.
Defense Counsel: And you answered that question "I have," did you not?
Witness: I did.
Defense Counsel: At line 17 on page 109, I asked you the following question, did I not, referring to that other view "It was a widely-held view at one point in time"?
Plaintiffs' Counsel: Objection, again.
Court: What page?
Defense Counsel: Page 109; line 17.
Plaintiffs' Counsel: Objection to the form of the question. He said he is referring to some other view.
Defense Counsel: I'll withraw [sic] it, Your Honor, and try it again. Let's go back and pick it up at line two on page 109 where you said that you have heard there's a view that heterotopic ossification can be increased or aggravated by range of motion. At line three I said to you, did I not, "You have heard that?" And you answered "Yes."
Witness: Correct.
Defense Counsel: And at line five I said, "You don't happen to agree with you [sic], do you?" And you said, "No." You don't agree with it. It's still your feeling?
Witness: Yes.

*536 Defense Counsel: Number seven, I asked you the question "There is a respected body of authority that differs with you on that part?" And you said "Speak of that again"; is that right?
Witness: Yes.
Defense Counsel: And so I said the question at line 10, "There are respected medical doctors, authorties [sic], who are of the view that range of motion is contraindicated for heterotopic ossification?" And your answer was, was it not, "In my opinion, there are doctors who don't feel this should be done in the past, not now." Correct?
Witness: Correct.
Defense Counsel: And I asked you, "You think that that view is on the wane?" And you said it was "passe"; correct?
Witness: Correct.
Defense Counsel: And then I said at line 17, "It was a widely-held view at one point in time?" And you said, "Not widely-held"; right?
Witness: Right.
Defense Counsel: And then I said it was respected? And your answer was "yes"?
Witness: Yes.
Defense Counsel: And you are still of the view that at one time that was a respected view?
Witness: Yes.
Defense Counsel: ... Do you happen to know that that view is still held by a number of respected physicians, namely, that  in the presence of heterotopic ossification, you should stop range of motion activity?
Witness: I can't imagine anybody holding it, but I suppose there are.
Defense Counsel: You haven't read about it lately, have you? You haven't read about that subject lately to see what other people are saying in the medical literature on that subject?
Witness: No.

*537 Defense Counsel: When is the last time you looked into the medical literature to find out what other people were saying about the subject of range of motion in the presence of heterotopic ossification?
Witness: Well, all the time; but I don't recall that this has been a highly regarded method of management of heterotopic ossification, in the light of all of our current knowledge.
N.T., 10/29/87, at 88-92.
There is no indication in the testimony just quoted as to when the alternative point of view was a respected one. To assume, without any factual basis for doing so, that the viewpoint was still respected in 1980-81, at the time of Michael Maurer's treatment at HUP, would be to draw an inference in favor of appellants. Our narrow scope of review requires that we do the opposite, however. Accordingly, we conclude that appellants' claim concerning the "two schools of thought" doctrine is without merit.[6] Having considered the issues raised by appellants in light of the evidence of record and the appropriate scope of review, we conclude that Dr. Rogers is not entitled to judgment n.o.v.[7]
*538 The parties' remaining claims concern delay damages and post-verdict interest. Before considering these claims, it is essential that we determine the effect on the judgment as a whole of the decisions made thus far. Where a jury found each of two defendant physicians to be 25% liable and the defendant hospital to be 50% liable, and this Court orders that judgment n.o.v. be granted to one of the defendant physicians but not to the other, how is the judgment to be remolded? Having discovered no case directly on point, we conclude that this is an issue of first impression in this Commonwealth.
However, two opinions of this Court, although not factually the same as the one before us, are nevertheless instructive. In the first of these cases, Henze v. Texaco, Inc., 352 Pa.Super. 538, 508 A.2d 1200 (1986), the plaintiff was injured when she fell after stepping on a loose threshold in the doorway of the office of Rice's Texaco Station. The jury apportioned negligence as follows: plaintiff, 35%; appellant Texaco, Inc., the lessee, 52%; and David Rice, the sublessee, 13%. This Court concluded that the trial court should have granted judgment n.o.v. to Texaco because Texaco had received neither actual nor constructive notice of the unsafe condition of the threshold. This Court then analyzed the effect of its decision as follows:
We are now faced with an issue of first impression in Pennsylvania. Having determined that Texaco should have been awarded a judgment n.o.v., what is the effect of the judgment n.o.v. upon the jury's findings that Mrs. Henze's [the plaintiff's] causative negligence was 35% and David Rice's negligence was 13%? An answer can be found in the decisions of the Supreme Court of Wisconsin, where the Court recognized that any attempt by a court to reapportion the negligence found by the jury would be speculative and, therefore, improper. The better practice, the Wisconsin court held, is to order a new trial with respect to the other parties. See: Chart v. General Motors Corp., 80 Wisc.2d 91, 112, 258 N.W.2d 680, 689 (1977); Nelson v. L. & J. Press Corp., 65 Wisc.2d 770, 783, 223 N.W.2d 607, 614 (1974). We are constrained to agree that an attempt by a court to *539 reapportion negligence in this case would be speculative. The issue of damages, however, has been fairly tried. Indeed, none of the parties have suggested error with respect to the trial of the damage issue. Similarly, there is no need to re-try the jury's finding that Leo and Rose Pancari [the owners and lessors] were not negligent. The only issue requiring a retrial is the apportionment of the negligence of Virginia Henze and David Rice.
Id., 352 Pa.Superior Ct. at 546-47, 508 A.2d at 1205.
Shortly thereafter, this Court decided the factually similar case of Kobylinski v. Hipps, 359 Pa.Super. 549, 519 A.2d 488 (1986). That case involved a wrongful death and survival action brought by the executrix of the estate of the decedent, who had fallen to his death in an unguarded exterior stairwell attached to a residence owned by appellant and leased to appellee. The jury apportioned negligence as follows: decedent, 5%; appellee, 20%; and appellant, 75%. This Court, relying upon its earlier opinion in Henze v. Texaco, supra, reversed the judgment and remanded the case to the trial court for the entry of judgment n.o.v. in favor of appellant and for a new trial on the issue of the causative negligence of appellee and the decedent. Id., 359 Pa.Superior Ct. at 558-59, 519 A.2d at 493.
Although a cursory reading of the cases just cited suggests that the same result is warranted here, there are two significant differences between those cases and the present one. First, the award of judgment n.o.v. in the present case will not leave two parties each of whom was independently negligent, as in the other cases, but rather one party (Dr. Rogers) who was actively negligent and one party (HUP) whose negligence derives from that of the other. In its instructions to the jury the trial court noted that the plaintiffs' action against HUP was based on a theory of "ostensible agency" (N.T., 11/9/87, at 68) and that "[i]f you find that the hospital didn't hold out Dr. Gennarelli and Dr. Rogers as its employee [sic] ..., then you should find no apparent agency or relationship existed and your verdict should be in favor of the defendant hospital ..." (N.T., 11/9/87, at 68-69).
*540 Second, the case before us presents a more complicated question of damages. In each of the earlier cases, the entire extent of the plaintiff's injuries, and therefore the entire extent of his or her damages, resulted from a single, identifiable action: falling over a loose threshold, in Henze v. Texaco; falling down an unguarded stairwell, in Kobylinski v. Hipps. In the present case, by contrast, it was alleged that Michael Maurer was injured by two negligent courses of conduct (Dr. Gennarelli's failure to administer Didronel, and Dr. Rogers' failure to ensure adequate physiotherapy), and we have concluded that appellees failed to prove that one of these courses of conduct was in fact negligent.
Given these factual differences, we conclude that this Court's earlier decisions in Henze v. Texaco and Kobylinski v. Hipps, while helpful to our analysis, do not tell us how to reapportion liability in the case before us. One possible solution is to conclude that the ratio of HUP's liability to Dr. Rogers' liability, which was two to one, should remain the same, with the percentages changing to two-thirds for HUP and one-third for Dr. Rogers, and with damages to be apportioned accordingly.
The difficulty with this solution is that it assumes that the amount of damages should remain the same. As the trial court instructed the jury, however, "[d]amages are intended to compensate the plaintiff for the harm caused by a legal wrong, for which a defendant is legally responsible" (N.T., 11/9/87, at 74). The jury concluded that for the harm resulting from the active negligence of Drs. Gennarelli and Rogers, appellants should receive $3,423,115.00 in compensation. We are reluctant to conclude that the negligence of Dr. Rogers alone resulted in harm entitling appellants to fully the same amount of damages.
Another possibility is to remold the verdict in strict accordance with the jury's division of liability: since Dr. Gennarelli is no longer considered to be negligent, the award of damages is to be reduced by his share of liability, or 25%; and since HUP's 50% share of liability derives from the liability of its agents, the award of damages is to be reduced by an additional *541 25%. The effect of such a solution would be to halve the award of damages.
Whether the jury would have reached precisely this result if Dr. Gennarelli had not been a defendant cannot be known, however. Therefore, we conclude that the better course is to vacate the judgment and to remand the case for entry of judgment n.o.v. in favor of Dr. Gennarelli and for a new trial on the issue of damages resulting from the negligence of Dr. Rogers and HUP. As the judgment is to be vacated, we decline to address appellants' claim concerning the award of delay damages pursuant to revised Pa.R.C.P. 238.

APPEAL AT NO. 1594 PHILADELPHIA 1990
Appellees contend in their cross-appeal that the trial court erred in failing to award post-verdict interest 1) on the portions of the molded verdicts representing delay damages and 2) up to entry of final judgment. In light of our resolution of the direct appeal, consideration of these issues is unnecessary.
Judgment vacated; case remanded to the trial court for entry of judgment n.o.v. in favor of Dr. Gennarelli and for a new trial as to damages with respect to Dr. Rogers and HUP; jurisdiction relinquished.
JOHNSON, J., files a concurring and dissenting statement.
FORD ELLIOTT, J., joins in the concurring and dissenting statement by JOHNSON, J.
JOHNSON, Judge, concurring and dissenting.
With respect to the appeal by the Hospital of the University of Pennsylvania and Doctors Gennarelli and Rogers, I agree with the majority that the expert testimony with regard to the administration of physiotherapy was both competent and sufficient to establish the standard of care. I must respectfully dissent from my colleagues' conclusion that Dr. Dillon's testimony was insufficient to establish that the failure to administer the drug didronel deviated from the accepted standard of medical care.
*542 I find no fault in the rules of law to be applied in considering this appeal as set forth by President Judge Rowley in his Opinion. However, I find, upon my own review of the testimony of Dr. Dillon, that there is ample testimony to support the jury verdict. I cannot say that the verdict entered against Dr. Gennarelli was improper. Accordingly, I dissent from the entry of judgment notwithstanding the verdict in his favor.
Since I find no fault with the jury's verdict, I would address the contentions that the award of delay damages was improper and the cross-contention that the plaintiffs are entitled to post-verdict interest both on the delay damages' portion of the molded verdict and up to entry of final judgment. Both of these issues have been adequately covered in the Opinion of the distinguished trial court, the Honorable Levan Gordon, dated November 28, 1990 and filed December 4, 1990, pages 9 through 13. On these issues, I would affirm on that portion of Judge Gordon's Opinion.
FORD ELLIOTT, J., joins.
NOTES
[1] Although appellants also request, as an alternative, that the judgment be vacated and a new trial granted, they include in their original brief no argument as to why this alternative form of relief is warranted if judgment n.o.v. is not.
[2] There is an exception to the general rule: expert evidence is not required where the matter in dispute is so simple and the lack of skill or want of care so obvious as to be comprehensible by lay persons. Brophy v. Brizuela, supra. It is evident, given the extremely specialized nature of the medical care at issue, that the exception is inapplicable here.
[3] Michael can walk short distances only with the aid of a walker.
[4] Dr. Dillon had indicated earlier that he entered the case at the request of Mr. Rubino, whose firm, Case Management, provided reviews by physicians of matters which lawyers submitted to the firm.
[5] The date as typed is "2/21/1980," which would obviously be incorrect; the correction "12/22" is handwritten on the trial transcript.
[6] Whether Dr. Dillon's testimony otherwise met the standard (i.e., "a considerable number of recognized and respected professionals") recently set forth by the Supreme Court in Jones v. Chidester, supra, is a question that is not before us.
[7] Appellants also contend that 1) because the trial court did not separate the question of negligent treatment of heterotopic ossification from the question of negligent physiotherapy, but instead phrased the question for the jury as whether there was negligent conduct in the treatment of the heterotopic ossification, and because only Dr. Gennarelli was responsible for dealing with the heterotopic ossification, the jury should have been instructed to disregard the issue of physiotherapy; 2) there was no factual basis to support a finding of negligence against any of the defendants with regard to the decubitis ulcer or bedsore, as there was no evidence of record to establish the source of the bedsore.

These issues are not stated or suggested in appellants' Statement of the Questions Involved, where appellants' second issue reads as follows: "Did plaintiffs in this medical malpractice case present competent expert testimony to establish the standard of care with respect to the administration of physiotherapy?" (Original Brief for Appellants at 3). Accordingly, we decline to consider them. Pa.R.A.P. 2116(a); Vaskie v. West American Insurance Company, 383 Pa.Super. 76, 80 n. 1, 556 A.2d 436, 438 n. 1 (1989).