**Frank JOYCE and Kelly Anne Joyce, husband and wife, Appellants,**

**v.**

**BOULEVARD PHYSICAL THERAPY & REHABILITATION CENTER, P.C., a/k/a Boulevard Physical Therapy: and Rehabilitation Center, Karen Gentry, RPT, Randall N. Smith, M.D., and Palmaccio–Smith Associates.**

Superior Court of Pennsylvania.

Argued Feb. 11, 1997.

Filed May 7, 1997.

Reargument Denied July 2, 1997.

Thomas J. Wehner, Philadelphia, for appellants.

Francis J. McGovern, Blue Bell, for Gentry, appellee.

Before CIRILLO, President Judge Emeritus, and JOHNSON and OLSZEWSKI, JJ.

CIRILLO, President Judge Emeritus.

Frank Joyce and Kelly Anne Joyce appeal from an order entered in the Court of Common Pleas of Philadelphia County granting appellees' motion for nonsuit. We reverse.

While working on the roof of the Franklin Mills Mall in Philadelphia, Frank Joyce slipped and injured his right knee. After experiencing frequent buckling of the knee, Joyce sought care at Franklin Hospital. At the hospital his knee was placed in an immobilizer and he was instructed to see Dr. Randall Smith, an orthopedic surgeon. Dr. Smith provided care to Joyce, but was unable to make a conclusive diagnosis. He did, however, instruct Joyce to continue to wear the immobilizer and prescribe a regimen of physical therapy treatment which he recommended should be undertaken at Boulevard Physical Therapy and Rehabilitation, P.C. ("Boulevard"). Although Dr. Smith noted in Mr. Joyce's medical file that he was not to remove the immobilizer, this file was not sent to Boulevard. Moreover, the prescription sheet neither mentioned a diagnosis, nor did it contain an instruction prohibiting a physical therapist from removing the knee immobilizer or an instruction to the physical therapists at Boulevard to contact him (Dr. Smith) prior to removing the immobilizer from Joyce's knee.

Approximately one week later, Joyce commenced his treatment at Boulevard under the supervision of physical therapist Karen Gentry. Unaware of any instructions to the contrary, Ms. Gentry removed the immobilizer during treatment and replaced it at its conclusion. After his third treatment, Ms. Gentry instructed Joyce to refrain from wearing the immobilizer altogether, because she felt that his knee was improving. Upon arriving home from his third treatment, and eager to further the progress which he thought he was making, Joyce performed exercises without his immobilizer as directed by Ms. Gentry. During the exercises, however, his knee buckled, and he fell, striking his head and right knee upon the floor. Joyce was subsequently taken to the hospital

where he was diagnosed with severe chondromalacia.[1]

Joyce initiated a lawsuit against Dr. Smith and Boulevard alleging that Dr. Smith was negligent in failing to contact Boulevard either in writing or orally to explain that Joyce was required to wear the immobilizer until further notice.[2] At trial, Joyce offered testimony from Dr. Irving R. Ratner, a Board Certified orthopedic surgeon, that the standard of care that orthopedic surgeons must undertake in referring their patients to physical therapy treatment centers is to contact the center, either orally or in writing, to explain any specific instructions that the center must follow. Dr. Ratner opined that in failing to specifically discuss Mr. Joyce's case with the physical therapist, Dr. Smith had breached his duty to appellant. Following Dr. Ratner's testimony, counsel for appellees objected, contending that Dr. Ratner had merely presented his own personal opinion of the standard of care, rather than an objective standard of care as required by law. The trial court reserved its ruling until the conclusion of the Joyces' case. After the plaintiffs rested, appellees renewed their objection. Upon hearing argument, the trial court sustained Boulevard's objection and struck Dr. Ratner's testimony. Immediately thereafter, appellees moved for a nonsuit, since Joyce had failed to elicit the standard of care much less a breach thereof. Agreeing with the appellees, the trial court granted their motion for nonsuit. Joyce filed a timely motion for removal of the nonsuit which was denied. This appeal followed. The Joyces present the following issues for our consideration:

1. Did the trial court not [sic] err in granting the motion for nonsuit after the defendants had marked and introduced exhibits raising elements of their defenses in the plaintiffs' case-in-chief, thereby eliminating the court's ability to consider only the plaintiffs' evidence for purposes of nonsuit?

2. Did the trial court not [sic] err when, after plaintiffs' expert orthopedic surgeon explicitly testified that, based on the standard of care in the community as known to him through his years of experience in the specialty, the defendant breached the standard of care, the court nonetheless struck all of the expert's testimony as being the expert's personal opinion, even after the expert expressly stated that his opinion was not mere personal opinion?

3. Did the trial court not [sic] err when it required that written medical literature must be relied on as a basis for a medical expert's opinion that a defendant surgeon breached the standard of care?

4. Did the trial court not [sic] err when it determined that the doctor-patient relationship between the defendant and the plaintiff was severed when the doctor ordered the plaintiff to be given physical therapy, when the doctor negligently omitted instructions to the therapist and the therapist was working under the doctor's orders?

5. Did the trial court not [sic] err in refusing to permit plaintiffs to present expert testimony on causation, although plaintiffs in pretrial expert discovery set forth the opinion that the negligence of defendants caused plaintiff's injuries?

■ Our standard of review in determining the propriety of an entry of nonsuit is that it is proper only if the factfinder, viewing all the evidence in favor of the plaintiff, could not reasonably conclude that the essential elements of a cause of action have been established. *Biddle v. Johnsonbaugh*, 444 Pa.Super. 450, 664 A.2d 159 (1995); *Orner v. Mallick*, 432 Pa.Super. 580, 584, 639 A.2d 491, 492 (1994). "When a nonsuit is entered, the lack of evidence to sustain the action must be so clear that it admits no room for

1. Irving Ratner, M.D. testified that Chondromalacia is the deterioration of the cartilage in the kneecap in which cartilage on the underside of the kneecap wears away to the point where the cap grinds against the knee joint. There are four stages of chondromalacia ranging from mild ("stage one") to post-traumatic ("stage four"). Following his second fall Joyce was diagnosed

with stage four chonrdomalacia, the effects of which include swelling and inflammation of the knee and a weakening of the thigh muscle.

2. Defendants Gentry and Boulevard settled with the Joyces prior to trial for $20,000.00.

fair and reasonable disagreement." *Gregorio v. Zeluck*, 451 Pa.Super. 154, 158, 678 A.2d 810, 813 (1996) (*citing Dion v. Graduate Hospital of Univ. of Pennsylvania*, 360 Pa.Super. 416, 520 A.2d 876 (1987)). A compulsory nonsuit can only be granted in cases where it is clear that a cause of action has not been established and the plaintiff must be given the benefit of all favorable evidence along with all reasonable inferences of fact arising from that evidence, resolving any conflict in the evidence in favor of the plaintiff. *Coatesville Contractors v. Borough of Ridley*, 509 Pa. 553, 506 A.2d 862 (1986); *Poleri v. Salkind*, 453 Pa.Super. 159, 683 A.2d 649 (1996). The fact-finder, however, cannot be permitted to reach a decision on the basis of speculation or conjecture. *Biddle*, 444 Pa.Super. at 455, 664 A.2d at 161.

The Joyces first contend that the trial court could not properly enter a nonsuit, because the appellees had already entered evidence before the motion for nonsuit was brought. Specifically, the Joyces point to the appellees' entrance into evidence of their affirmative defense, as well as certain exhibits during the cross-examinations of Dr. Ratner and Dr. Hume, as preclusive on the trial court from entering a nonsuit.

Pennsylvania Rule of Civil Procedure 230.1 governs compulsory nonsuits at trial. The Rule states, "In a case involving only one defendant, at the close of plaintiff's case on liability and **before any evidence on behalf of the defendant has been introduced** ... the court ... may enter a nonsuit." Pa.R.C.P. 230.1, 42 Pa.C.S.A. (emphasis added). Courts have applied Rule 230.1 strictly, and have held that they are without power to grant nonsuits where a defendant has offered evidence either during or immediately after plaintiff's case. *See Atlantic Richfield Co. v. Razumic*, 480 Pa. 366, 390 A.2d 736 (1978). *See also Robinson v. City of Philadelphia*, 149 Pa.Commw. 263, 612 A.2d 630 (1992) (defendant's presentation of evidence during plaintiff's case rendering the entry of compulsory nonsuit untenable). Additionally, we note that the power to grant a

non-suit may dissipate where a defendant exceeds proper bounds of cross-examination so as to elicit matters constituting a defense to the cause of action. *Atlantic Richfield*, 480 Pa. at 383, 390 A.2d at 744. These rules are to be strictly applied. *Storm v. Golden*, 371 Pa.Super. 368, 538 A.2d 61 (1988).

Here, appellees offered defense exhibits during appellant's case and the trial court had the exhibits before it when it evaluated the motion for compulsory nonsuit. The express language of Rule 230.1 and the above-cited authorities compel us to conclude that the trial court was not empowered to enter a nonsuit because appellee had offered evidence. Where, however, a court enters a nonsuit in violation of these rules, reversal is not mandated if the admission of some defense evidence is harmless error. *See Bowser v. Lee Hospital*, 399 Pa.Super. 332, 582 A.2d 369 (1990); *Storm v. Golden*, 371 Pa.Super. 368, 538 A.2d 61 (1988). *See also Kratt v. Horrow*, 455 Pa.Super. 140, 687 A.2d 830 (1996) (recognizing harmless error in entering non-suit where plaintiff fails to meets his burden of proof).

In *Storm, supra*, a case procedurally identical to the present case, our court found that although the trial court had erred in entering a nonsuit, since the defense had entered exhibits during the plaintiff's case, that such an error was harmless in light of the fact that plaintiffs had failed to offer the proper standard of care. *Storm*, 371 Pa.Super. at 374, 538 A.2d at 63. Accordingly, if we conclude that the plaintiff in the present case has failed to introduce the proper standard of care, then any error in entering a non-suit would be harmless.

Our paramount objective is, therefore, determining whether the trial court's error in entering a nonsuit was reversible or merely harmless error. *Bowser, supra; Storm, supra.* In determining whether the entry of nonsuit was harmless, we must first ascertain if the trial court properly concluded that the Joyces failed to establish the essential element of standard of care.[3] We note that our review must be

---

**3.** The requisite proof required for a medical malpractice action is well settled.

In order to establish a prima facie case of malpractice, plaintiff must establish (1) a duty

limited to whether the trial court committed a manifest abuse of discretion in excluding the Joyces' expert testimony. See *Tiburzio–Kelly v. Montgomery*, 452 Pa.Super. 158, 681 A.2d 757 (1996); *General Equipment Manufacturers v. Westfield Insurance Company*, 430 Pa.Super. 526, 635 A.2d 173 (1993). A trial court's discretion, however, is not unlimited, and where the ruling exceeds those limits and a party is prejudiced thereby, reversible error occurs. *Tiburzio–Kelly*, 452 Pa.Super. at 172, 681 A.2d at 764 (*citing Swartz v. General Electric*, 327 Pa.Super. 58, 71, 474 A.2d 1172, 1178 (1984)).

■ The trial court found that the Joyces had failed to offer any competent evidence in the form of expert testimony as to the proper standard of care under which Dr. Smith should have conducted himself and in what way his actions deviated from that standard. Thus, the trial court concluded that as a matter of law, the Joyces had failed to meet their burden of proof, warranting the entry of a nonsuit. The Pennsylvania Supreme Court in *Donaldson v. Maffucci*, 397 Pa. 548, 156 A.2d 835 (1959) explained the concept of standard of care as follows:

> The standard of care required of a physician or surgeon is well-settled.... A physician who is not a specialist is required to possess and employ in the treatment of a patient the skill and knowledge usually possessed by physicians in the same or a similar locality, giving due regard to the advanced state of the profession at the time of the treatment; and in employing the required skill and knowledge he is also required to exercise the care and judgment of a reasonable man. However, a physi-

cian or surgeon is not bound to employ any particular mode of treatment of a patient, and, where among physicians or surgeons of ordinary skill and learning more than one method of treatment is recognized as proper, it is not negligence for the physician or surgeon to adopt either of such methods.

*Donaldson*, 397 Pa. at 553–54, 156 A.2d at 838 (citations omitted). *Accord Maurer v. Trustees of Univ. of Pa.*, 418 Pa.Super. 510, 614 A.2d 754 (1992) *allocatur granted*, 534 Pa. 640, 626 A.2d 1158 (1993). The standard of care for a specialist acting within his or her specialty is higher. "[H]e or she is expected to exercise that degree of skill, learning and care normally possessed and exercised by the average physician who devotes special study and attention to the diagnosis and treatment of diseases within the specialty." *Maurer*, 418 Pa.Super. at 517–18, 614 A.2d at 758 (*quoting Pratt v. Stein*, 298 Pa.Super. 92, 156, 444 A.2d 674, 708 (1982)).

■ Generally, a plaintiff must introduce expert testimony to show that a defendant-doctor's conduct varied from accepted medical practice. *Brannan v. Lankenau Hospital*, 490 Pa. 588, 595, 417 A.2d 196, 199 (1980). "This requirement stems from judicial concern that, absent the guidance of an expert, jurors are unable to determine relationships among scientific factual circumstances." *Id.* at 595–96, 417 A.2d at 199–200 (*citing McMahon v. Young*, 442 Pa. 484, 276 A.2d 534 (1971)). The standard by which an expert witness is qualified, however, is a liberal one. *Lira v. Albert Einstein Medical Center*, 384 Pa.Super. 503, 559 A.2d 550 (1989). *See Flanagan v. Labe*, 446 Pa.Super.

---

owed by the physician to the patient; (2) a breach of duty from the physician to the patient; (3) that the breach of duty was the proximate cause, or substantial factor in bringing about the harm suffered by the patient; and (4) damages suffered by the patient that were a direct result of the harm.
*Mitzelfelt v. Kamrin*, 526 Pa. 54, 584 A.2d 888, 891 (1990); *Poleri*, 453 Pa.Super. at 166–67, 683 A.2d at 653; *Gregorio*, 451 Pa.Super. at 158, 678 A.2d at 813. Moreover, in proving his case, plaintiff is required to present an expert witness who will testify, to a reasonable degree of medical certainty, that the acts of the physician deviated from good and acceptable medical standards, and that such deviation was the proximate

cause of the harm suffered. *Flanagan v. Labe*, 446 Pa.Super. 107, 111, 666 A.2d 333, 335 (1995) (*citing Mitzelfelt*, 526 Pa. at 63–64, 584 A.2d at 892), *aff'd* 547 Pa. 254, 690 A.2d 183 (1997); See *Maurer v. Trustees of Univ. of Pa.*, 418 Pa.Super. 510, 614 A.2d 754 (1992) *(en banc)*. An exception to the expert testimony requirement exists only where the physician's departure from the norm is so simple and obvious, that it lies within the comprehension of ordinary laypersons. *Gregorio*, 451 Pa.Super. at 158, 678 A.2d at 813. Because standard of care is an essential element in proving a prima facie case of medical malpractice, if the appellants have failed to prove it, any error in granting a non-suit would be harmless. *Bowser, supra; Storm, supra.*

at 111, 666 A.2d at 335 (1995) (nurse properly testified to standard of care pertaining to certain acts where she had in fact performed those acts). "If a witness has any reasonable pretension to specialized knowledge on the subject under investigation he may testify, and the weight to be given to his [testimony] is for the jury." *Lira*, 384 Pa.Super. at 509, 559 A.2d at 552 (*quoting Kuisis v. Baldwin–Lima–Hamilton Corp.*, 457 Pa. 321, 338, 319 A.2d 914, 924 (1974)).

The trial court concluded that the expert testimony provided by Dr. Ratner did not address the course of conduct the average orthopedic surgeon would undertake during the course of Mr. Joyce's treatment, but rather what Dr. Ratner personally thought was the standard of care. The trial court and appellees rely heavily upon *Maurer, supra*, in supporting this conclusion. We believe that this reliance upon *Maurer* is misplaced.

In *Maurer*, the plaintiff suffered a severe brain injury which left him comatose and hospitalized at the Hospital of the University of Pennsylvania (HUP) for approximately six months. Two months after his arrival at HUP, plaintiff awoke and was treated by one of the defendants, a neurosurgeon. During his stay, plaintiff experienced heterotropic ossification, a disorder that causes a person's joints to harden, rendering them inflexible. Plaintiff also developed a decubitis ulcer, commonly known as a bedsore. Plaintiff filed suit against the neurosurgeon alleging that his failure to administer a drug entitled Didronel to the plaintiff caused the hardening of the joints, as the medicine would have prevented the disorder. Plaintiff also filed suit against his doctor in charge of physical therapy for failure to provide more frequent exercise, thus, permitting his joints to harden more than they should have. Both doctors were found equally liable. An appeal followed in which our court, sitting *en banc*, held that plaintiff's expert was unable to articulate a standard of care with regard to the administering of Didronel. *Maurer*, 418 Pa.Super. at 525–26, 614 A.2d at 762–63. We

based our decision primarily upon the fact that at the time plaintiff was admitted to HUP, the use of Didronel had not moved beyond the experimental phase, which was evidenced by the plaintiff's expert's inability to provide a definitive standard of care on the use of the drug. *Id.* "If [the expert] had indicated in his testimony that the use of Didronel ... had moved beyond the experimental arena ... the imprecision with which he defined the terms 'standard of care' and 'acceptable medical standards' might weigh less heavily in our analysis." *Id.*

Presently, the trial court read *Maurer* as standing for the proposition that an expert's personal opinion as to the standard of care is improper. Specifically, the trial court reasoned that because the plaintiff's expert testified in the first person when articulating the standard of care, and because he did not provide concrete support for his opinion, that he was testifying as to his personal opinion, rather than the objective standard of care articulated in *Donaldson* and its progeny.

While we agree that the standard of care is objective, we cannot agree that merely because some of Dr. Ratner's testimony was in the first person transforms his elicitation of the standard of care into his personal opinion. We explained in *Maurer* that merely because the expert elicited the standard of care in the first person does not equate to the rendering of a personal opinion. *Id.* at 518–20, 614 A.2d at 759.[4] Rather, in finding that plaintiff's expert had failed to articulate a standard of care regarding the administration of Didronel, we emphasized that there can be no general standard of care with regard to wholly experimental treatments, especially when there is a lack of concrete evidence. *Id.* at 524–28, 614 A.2d at 762–63. In essence, we explained that not only would it be unfair to hold doctors to duties where the effects are yet unknown, but that more importantly, such a requirement could be dangerous. We, therefore, concluded that the plaintiff's expert must have misunderstood what the term "standard of care"

---

**4.** We stated although the testimony in *Maurer* was articulated in the first person, when looking at the testimony as a whole, including the questions put to the expert that it was reasonable to conclude that the expert was testifying objectively. *Maurer*, 418 Pa.Super. at 518–22, 614 A.2d at 759–60.

meant, and rather, was rendering his personal opinion upon how the plaintiff should have been treated. *Id.*

In the present case, an orthopedic surgeon testified to the applicable standard of care in referring patients to physical therapists. The Joyces' expert testified that Dr. Smith either should have discussed Mr. Joyce's case with the physical therapist or specified written instructions on the referral sheet. This is not a matter, as in *Maurer*, of whether to administer an experimental medication. Rather, this is simply a matter of routine procedure. Most, if not all orthopedic surgeons prescribe patients to physical therapists. It is well within the knowledge of an orthopedic surgeon, such as Dr. Ratner, to articulate an opinion upon the standard of care when referring patients to physical therapists. We do not feel that it was necessary to have Dr. Ratner cite to treatises and medical periodicals to support his articulation of the standard of care. As explained by our supreme court in *Collins v. Hand,* 431 Pa. 378, 246 A.2d 398 (1968), the standard of care in medical malpractice actions is first and foremost what is reasonable under the circumstances. Dr. Ratner's thirty years in the field of orthopedic medicine, is sufficient to support an articulation of the relevant standard of care.[5] According the Joyces all the favorable evidence, as we must, Dr. Ratner's use of the first person in describing the standard of care did not necessarily mean that he was presenting a personal opinion. As noted, Dr. Ratner responded to the question of what the relevant standard of orthopedic care was in the community. In its entirety, then, Dr. Ratner's testimony could have reflected the relevant standard of care.

The trial court reasons, however, that as a matter of law, an orthopedic surgeon's duty to his patient is severed upon the transcription of the prescription for physical therapy. Accordingly, the trial court explains, the entry of non-suit was nonetheless proper. We disagree.

Because a physical therapist is akin to a pharmacist in the eyes of the law, our conclusion is guided by the dynamics surrounding the physician / pharmacist relationship. *See Leidy v. Deseret Enterprises, Inc.,* 252 Pa.Super. 162, 170, 381 A.2d 164, 169 (1977) ("the therapist's status is comparable to that of a druggist"). A physician's duty to a patient in prescribing medicine is not extinguished once the prescription sheet is handed to the pharmacist. *See Riff v. Morgan Pharmacy,* 353 Pa.Super. 21, 508 A.2d 1247 (1986) (noting that both a doctor who negligently fails to alert the pharmacist of proper dosage and pharmacist who fills prescription may be held liable). A pharmacist cannot, therefore, escape liability by asserting negligence on the part of the physician. *Riff, supra.* A negligent physician cannot, likewise, escape liability by hiding behind the negligence of a pharmacist. Our reasoning is based primarily upon the realization that both the doctor and the pharmacist are vital to our medical system and that both independently owe a duty of care to the patient. To excuse negligent conduct of one based upon negligent conduct of another would result in a breakdown of the system.

We think that the relationship between an orthopedic surgeon and a physical therapist is analogous to the relationship between a physician and a pharmacist. When an orthopedic surgeon writes a prescription for his or her patient to see a physical therapist, that surgeon is charged with the same responsibilities as if he or she were writing a prescription for medication. Likewise, when a physical therapist dispenses the prescription, that physical therapist is charged with exercising due care. We will not condone the negligent conduct of one as an escape valve for the negligent conduct of the other. If we were to conclude that an orthopedic surgeon could wash his or her hands of any patient merely by asserting that he had sent his patient to a physical therapist, we would

---

5. We also disagree with the trial court's reasoning that because excerpts of Dr. Ratner's testimony are in the first person he merely gave his personal standard of care. As previously mentioned, we are obliged to examine an expert's testimony as a whole, not piecemeal. *See Maur-* *er, supra.* Upon examination of Dr. Ratner's expert testimony in its entirety, it is clear that he understood the concept of standard of care and that he articulated the standard based upon that correct understanding.

be encouraging negligent prescriptions and laying the entire blame for resultant injuries upon the physical therapist. This we will not do.[6]

■ Having concluded that Dr. Ratner properly testified as to an orthopedic surgeon's standard of care, we must now address appellees' claim that nonsuit was nonetheless proper because the Joyces have failed to satisfy their burden of proof on the essential issue of causation.[7] Appellees contend that the trial court's error in granting a nonsuit was harmless, because the Joyces failed to prove causation. *See Bowser, supra; Storm, supra.* Appellees argue that the Joyces failed to present any evidence that Dr. Smith's breach actually caused Mr. Joyce's injury.[8] Appellants counter that they did present sufficient evidence that Dr. Smith's breach was the cause of Mr. Joyce's injury and that if there were insufficient evidence, the reason was that the trial court erred in failing to permit their expert, Dr. Ratner, from testifying on the issue of causation.

■ As previously noted, a plaintiff must, in addition to proving that the defendant breached a duty owed to the plaintiff, establish that the breach was the proximate cause of bringing about the harm suffered by the plaintiff. *Mitzelfelt, supra.* Typically, in medical malpractice actions, causal connection between the care provided by a physician and the resulting injury is not amenable to proof to such a reasonable degree of medical certainty. *Poleri,* 453 Pa.Super. at 168–70, 683 A.2d at 654. *See Jones v. Montefiore Hosp.,* 494 Pa. 410, 431 A.2d 920 (1981); *Cohen v. Albert Einstein Medical Center,* 405 Pa.Super. 392, 592 A.2d 720 (1991); *Bowser, supra.* In such cases, we require only that the treating physician's negligence was a substantial factor in causing plaintiff's injury. *Id.* Our courts have defined substantial factor as follows:

> Once a patient-plaintiff shows that a physician-defendant's negligence increased the risk of harm and that harm actually occurred, sufficient evidence has been offered to submit the case to a jury.

*Mitzelfelt,* 526 Pa. at 63 n. 1, 584 A.2d at 892 n. 1. Accordingly, if a plaintiff has proven that the physician's breach increased the risk of harm, then there is sufficient evidence to overcome a non-suit, that is, the question of whether that conduct caused the plaintiff's ultimate injury requires a jury determination. *Id.; see Montgomery v. South Philadelphia Medical Group, Inc.,* 441 Pa.Super. 146, 656 A.2d 1385 (1995); *Clayton v. Sabeh,* 406 Pa.Super. 335, 594 A.2d 365 (1991).[9]

---

**6.** For these reasons we decline to characterize the relationship between a physical therapist and an orthopedic surgeon as one between a general physician and a specialist. Appellees explain that, generally, physicians cannot be held accountable for referring their patients to specialists or for other physicians covering for them. *See Strain v. Ferroni,* 405 Pa.Super. 349, 592 A.2d 698 (1991) (physician not liable for acts of covering physician); *Hannis v. Ashland State General Hospital,* 123 Pa.Commw. 390, 554 A.2d 574 (1989) (physician not liable for actions of specialist to whom he referred plaintiff). This case is not a referral to another medical doctor. Mr. Joyce was still under the care of Dr. Smith during his physical therapy sessions. Physical therapists, while highly trained; are not medical doctors, rather they are akin to pharmacists and can treat only that which the doctor orders.

The trial court reasons that it is impossible to hold a physician accountable for independent actions taken by a physical therapist. Utilizing the trial court's logic, then, a physician who writes an incomplete prescription for medication and upon which a pharmacist makes assumptions and fills without contacting the physician, would be released from liability because of the pharmacist's independent actions. As we explained in *Riff, supra,* such a result is unacceptable.

**7.** Because it is well-settled that we may affirm an order of a trial court on any grounds, in the interests of judicial economy, we will address appellant's causation issue.

**8.** Appellees also assert that the action of Ms. Gentry in removing the immobilizer from Mr. Joyce's knee was an independent intervening cause, and therefore, Dr. Smith's actions could not have proximately caused Mr. Joyce's injury. In light of our conclusion concerning an orthopedic surgeon's relationship with a physical therapist, however, this argument is meritless.

**9.** As with standard of care, plaintiffs must usually satisfy their causation burden with expert testimony. *See Cohen, supra.* Such testimony must, of course, be stated with a reasonable degree of medical certainty. *Id.*

The Joyces sought to present evidence that Dr. Smith's failure to transcribe specific instructions to Ms. Gentry regarding the removability of the knee immobilizer caused Mr. Joyce's fall, thereby increasing the risk that he would suffer from severe chondromalacia. The Joyces' presented the following evidence in support of causation. Ms. Gentry, the physical therapist, testified that Dr. Smith did not send any of Mr. Joyce's medical records, and that he had not contacted her in any way to explain that Mr. Joyce was required to wear the knee immobilizer. She further testified that had Dr. Smith indicated on the prescription sheet that Mr. Joyce was required to wear the immobilizer she would have called Dr. Smith to discuss the reasons and she would not have requested that Mr. Joyce remove the immobilizer without first consulting with Dr. Smith. Evaluating this evidence in the light most favorable to the plaintiff, plaintiff has made a prima facie showing that Dr. Smith's failure to convey to the physical therapist that Mr. Joyce's immobilizer was to remain on his knee caused Ms. Gentry to remove the immobilizer.

In order to complete the causal link, however, the Joyces were also required to prove that the removal of the immobilizer increased the risk that Mr. Joyce's knee would buckle, thereby causing Mr. Joyce's injury, severe chondromalacia. *See Mitzelfelt, supra.* At trial, the Joyces were precluded from questioning their experts, Doctors Ratner and Hume,[10] regarding the precise question as to whether removal of the immobilizer did in fact increase the risk that Mr. Joyce's knee would buckle, thus aggravating his original injury to severe chondromalacia. The trial court concluded that the experts were not entitled to testify regarding causation, because this function is left solely to the province of the jury. We disagree.

As previously discussed, where the events and circumstances of a malpractice action are beyond the knowledge of the average lay person, the plaintiff is required to present expert testimony that defendant's negligence was a substantial factor in causing the harm suffered. *Mitzelfelt,* 526 Pa. at 62, 584 A.2d at 892; *Montgomery,* 441 Pa.Super. at 155, 656 A.2d at 1390. *See also Cohen, supra.* Here, the Joyces attempted to prove that the removal of the knee immobilizer increased the risk that Mr. Joyce's knee would buckle. Because the average lay person is not familiar with the use and purpose of a knee immobilizer, expert testimony was necessary to explain not only the particular function that it served, but whether removing it from Mr. Joyce's knee in the condition that his knee was in, increased the risk that the knee would buckle. Moreover, expert testimony was also required to explain whether and to what extent this second fall aggravated Mr. Joyce's original injury. As we explained in *Montgomery,* "[i]f the witness possesses knowledge outside the ordinary reach and offers testimony which could assist the trier of fact, the witness may testify as an expert." *Montgomery,* 441 Pa.Super. at 152, 656 A.2d at 1388. Clearly expert testimony would assist the trier of fact. Accordingly, it was error for the trial court to exclude the testimony of Doctors Ratner and Hume. *Mitzelfelt, supra; Montgomery, supra.*[11]

10. Dr. Hume's testimony was elicited via a videotaped deposition, however, certain portions, including testimony concerning Dr. Hume's opinion as to whether Mr. Joyce's second fall increased the risk of his suffering from severe chonrdomalacia, were redacted.

11. Appellees contend, however, that the trial court was correct in excluding Drs. Ratner and Hume testimony on causation, since such testimony went beyond the fair scope of their expert reports. *See* Pa.R.C.P. 4003.5(c) (an expert witness may not testify on direct examination concerning matters which are either inconsistent with or go beyond the fair scope of the matters testified to in discovery proceedings or included in a separate report); *Greer v. Bryant,* 423 Pa.Super. 608, 621 A.2d 999 (1993). *See also Pascale v. Hechinger Company of Pennsylvania,* 426 Pa.Super. 426, 435, 627 A.2d 750, 754 (1993) ("Experts may testify at trial concerning matters which are within the fair scope of a pretrial report."). "The avoidance of unfair surprise to an adversary concerning the facts and substance of an expert's proposed testimony is the primary purpose of the rule requiring that testimony be within the fair scope of the pretrial report." *Id.* The trial court did not make such a finding, nor does the record contain certified copies of these reports. We are unable, therefore, to address this argument.

In conclusion, we find that the trial court erred in granting a nonsuit, because the Joyces presented proper evidence concerning the applicable standard of care through the testimony of Dr. Ratner. Additionally, the Joyces presented prima facie evidence that had Dr. Smith transcribed instructions on the prescription sheet that the physical therapist would not have removed the immobilizer from Mr. Joyce's knee. The Joyces were precluded from questioning their experts as to whether: (1) the removal of the immobilizer increased Mr. Joyce's risk that he would fall; and (2) the fall increased the risk that his original injury would be aggravated to grade four chondromalacia. Because the Joyces were precluded from eliciting this testimony, we cannot determine whether they have failed to satisfy their burden of causation. Sustaining an entry of non-suit, therefore, would be improper, since it is not clear whether plaintiff has established a cause of action in negligence. *Biddle, supra; Gregorio, supra; Coatesville Contractors, supra.* Accordingly, we must reverse the order of the trial court and remand for a new trial. *See Poleri, supra.*

Order reversed. Case remanded for a new trial. Jurisdiction relinquished.