J-A05005-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COREY GREEN | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JOHN PALFREY, MONROE ENERGY, | : | No. 2424 EDA 2022 |
| LLC AND MIPC, LLC | : | |

Appeal from the Judgment Entered November 4, 2022
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s):  200900435

BEFORE:  LAZARUS, J., KUNSELMAN, J., and MURRAY, J.

MEMORANDUM BY LAZARUS, J.:                    **FILED MAY 23, 2023**

Corey Green appeals from the judgment, entered in the Philadelphia Court of Common Pleas, in favor of John Palfrey, Monroe Energy, LLC, and MIPC, LLC (collectively, Appellees).  After review, we affirm.

Green, a career truck driver, had been working for Samuel Coraluzzo and Company (Coraluzzo) transporting fuel when he sustained a shoulder injury.  Green's job required him to fill up a tanker trailer with fuel at a local terminal, transport the fuel to a local gas station, and then unload the fuel at the gas station.  ***See*** N.T. Jury Trial, 4/19/22, at 57.  Green's job description required that he be able to lift 60 pounds waist high.  ***See*** N.T. Deposition of Richard Zamarin, M.D., 4/14/22, at 44.  Green explained the fuel filling process as follows:

> You enter the terminal, and then you pull into what you call a rack.
> The racks . . . are where you fuel the trucks up. [] Externals are

units attached to the trailer that come out, and what I would do, I would take [the] loading arm, and lock [it] on, make sure it's secure, and I would lock it onto each of the units, and that's how the fuel comes from the terminal into the trailer[.]

*Id.* at 57-58.

Green testified that his injury occurred between the late-night hours of September 18, 2019, and the early morning hours of September 19, 2019, while filling his tanker trailer with fuel at the G Street Terminal in Philadelphia for the fourth time that shift. **See** N.T. Jury Trial, 4/19/22, at 54-55, 71, 87. At the time, Appellees Monroe Energy and MIPC owned, operated and managed the G Street Terminal.[1] Additionally, Appellee Palfrey, an agent or employee of Monroe Energy and MIPC, was the person responsible for operating the G Street Terminal. Green stated the accident occurred as, "[he] was lifting the arm . . . trying to line it up with the trailer, [when he] felt a burning sensation, and then [he] felt a pop." **Id.** at 68; **id.** at 69 (Green testifying "[his shoulder] started stinging and radiating"). Green explained that the G Street Terminal fill arm, which he used at least four times each night, was "very hard to move . . . very stiff . . . [and it] required a lot of

_____

[1] MIPC, LLC, a wholly-owned subsidiary of Monroe Energy, owns and operates Monroe Energy's fuel storage and distribution networks. MIPC has three facilities, including the G Street Terminal. **See** Monroe Energy: https://www.monroe-energy.com/ (last accessed 4/24/23). John Palfrey is a terminal operator at MIPC.

- 2 -

strength to move those particular arms."[2]  *Id.* at 66-67; *id.* at 56 (Green recalls using G Street Terminal every day since working at Coraluzzo).

That same day, Green called his supervisor, who told Green to go to Concentra, a medical clinic, where Green was prescribed pain medicine and physical therapy.  *Id.* at 71; *see* Zamarin-4 (Concentra report stating Green injured while lifting loading arm at work and felt right shoulder pain immediately).  Concentra performed an MRI, which revealed a rotator cuff tear in his right shoulder.  *Id.* at 71.  Concentra advised Green to receive treatment by an orthopedic specialist.  He then saw Richard Zamarin, M.D., an orthopedic specialist, who performed arthroscopic (joint) surgery on Green's right shoulder on January 10, 2019.  *Id.* at 74.  Doctor Zamarin testified regarding an August 10, 2021 report he had authored, in which he concluded:  "[Green's partial rotator cuff tear in his right shoulder] was due to a work-related injury [incurred] o[n] September 19, 2018."  N.T. Deposition of Richard Zamarin, M.D., 4/14/22, at 20.

Green also testified that on September 15, 2018, four days prior to the G Street Terminal incident, he had gone to Roxborough Memorial Hospital

---

[2] Charles Lyons, a self-employed commercial truck driver, presented similar testimony.  He testified that he used the fill arm at the G Street Terminal in September 2018, when he worked for Coraluzzo, that the arm was "difficult to maneuver," and that "[he] had to put some force, some brute force behind it just to get the arms to [] line up with the loading portals on the truck."  N.T. Jury Trial, 4/19/22, at 139.  Lyons attempted to testify that the G Street Terminal fill arm was more difficult to maneuver as opposed to other fill arms. However, defense counsel objected and the court sustained his objection "as to other locations."  *Id.*

complaining of soreness, weakness, and burning in his right shoulder. N.T. Jury Trial, 4/19/22, at 77-78, 95; *see* Zamarin-6 (Roxborough Memorial medical record stating "[Green] reports right shoulder pain for one week. [Green] was moving heavy objects and fel[t] a pulling/burning sensation in the shoulder, the plain is starting to cause numbness and tingling down the arms and fingers."). Green testified that he did not explain the "arms" involved in fuel transport to the hospital but told the emergency room physician that he had "lifted some heavy equipment prior to this." *Id.* at 79 (Green stated, "telling [the hospital] about arms and stuff like that[,] they wouldn't understand"). Prior to discharging Green, hospital personnel performed an x-ray and prescribed Green a muscle relaxer. *Id.* at 105; *id.* at 80 (Green explaining doctors at Roxborough Memorial did not tell Green his shoulder was injured). The following exchange took place during cross-examination between defense counsel[3] and Green:

> Attorney Boyle: Do you see on that record where it says you have a suspected rotator cuff pain on exam?
>
> Green: Yes, I see that highlighted.
>
> Attorney Boyle: And you understood on September 15[, 2018,] that they suspected you had a rotator cuff injury, correct?
>
> Green: No, I didn't.

* * *

---

[3] Defendant John Palfrey is represented by Christopher Boyle, Esquire.

> Green:  I'm telling you that the emergency room discharged me with a muscle relaxer and did not inform me that I had a torn rotator cuff.

*Id.* at 100-01; *see id.* at 97-98 (Green stated he signed Roxborough Memorial Hospital document stating "strained right arm, muscle fascia and tendons of shoulder and upper arm"); *see* Zamarin-6, at 7 (Roxborough Hospital medical record stating x-ray shows "minimal spurring at acromioclavicular joint") (unpaginated).[4]

Doctor Zamarin testified that at the time he prepared his report, he was only aware of the September 19, 2018 incident where Green lifted the metal hose and suffered a right shoulder injury.  *See* N.T. Deposition of Richard Zamarin, M.D., 4/14/22, at 25; *see id.* at 30 (Doctor Zamarin testifying Green's September 15, 2018 hospital visit not mentioned in Concentra records).  After learning of Green's September 15, 2018 hospital visit and reading the Roxborough Memorial Hospital Emergency Room report, which Dr. Zamarin testified is the type of report he would normally review and rely on in his practice, he agreed he **would not** be able to determine, within a reasonable degree of medical certainty, whether Green sustained his injury on September 19, 2018, on September 15, 2018, or a week prior.  *Id.* at 39-40. Doctor Zamarin testified that treatment would be the same regardless of when

---

[4] Green also testified regarding his involvement in a July 2018 motor vehicle accident, in which he was stopped at a stop-sign when an unmarked police car, driving the wrong way on a one-way street, struck Green's vehicle.  Green stated that he had been placed on lifting restrictions due to the accident but he was no longer on lifting restrictions on September 19, 2018.  *Id.* at 118-19.

or why the injury occurred, but due to the hospital record, he is unable to determine whether the injury occurred on the job. *Id.* at 45 (Doctor Zamarin testifying, "The record [] from Roxborough Memorial Hospital just says heavy lifting. So I don't know where that was. [] My office record from Concentra stated that he was lifting on the job.").

On September 14, 2020, Green filed a complaint alleging that Appellees were negligent in their operation and maintenance of the G Street Terminal. *See* Complaint, 9/14/20, at 3-4. Green alleges that Appellees knew or should have known that the G Street Terminal was in a defective condition, which constituted a safety hazard to users of the equipment, and that Appellees failed to abate the dangerous condition. *Id.* at 5.

Specifically, Green claimed that Appellees' negligence consisted of the following: "allowing the fill pipe to be and remain in a dangerous and unsafe condition;" "failing to repair[, maintain, inspect and adjust] the fill pipe arm so that it could be [used] safely;" "failing to warn [Green] of the unsafe condition of the fill pipe;" "failing to properly train employees regarding maintenance[/use] and [the need to report malfunctions] of the fill pipe;" "ignoring reports of fill pipe arm malfunctions;" "failing to put in place a system for tracking reports of [fill pipe] malfunctions;" "failing to supervise []G[] Street Terminal staff;" "failing to discipline employees who ignore equipment malfunctions thereby creating an atmosphere where equipment malfunctions would be ignored;" and "creating an unsafe work site for business invitees." *Id.* at 6.

On April 19, 2022, prior to the start of trial, the court granted Appellees' motion *in limine*, prohibiting Green from presenting lay testimony, opinion, or evidence at trial that the G Street Terminal fill arm was defective or malfunctioned on the date his injury occurred. The court further provided that observations and personal perceptions or experiences regarding the fill arm were permitted. Order, 4/19/22.

Green rested his case on April 20, 2022, at which time Appellees moved for compulsory non-suit due to Green's failure to prove the standard of care and deviation therefrom as well as causation in this negligence action. The trial court entered non-suit on April 26, 2022. Green filed a motion to remove non-suit on May 1, 2022, which the trial court denied. The trial court entered judgment on November 4, 2022. This appeal timely followed. Both Green and the trial court have complied with Pa.R.A.P. 1925. Green presents the following issues for our review:

> 1. Did the trial court err as a matter of law when it ruled that to support a *prima facie* claim of ordinary negligence, [Green] was required to present evidence of a standard of care and/or deviation therefrom?
>
> 2. Where [Green's] medical expert testified, to a reasonable degree of medical certainty, that the cause of [Green's] shoulder injury was heavy lifting at [Palfrey's] terminal, did the trial court err in ruling that [Green] had not presented sufficient evidence of medical causation?

Appellant's Brief, at 4.

Appellate review of entry of a compulsory non-suit is well-settled:

> It is proper only if the fact[-]finder, viewing all of the evidence in favor of the plaintiff, could not reasonably conclude that the

- 7 -

essential elements of a cause of action have been established. When a non-suit is entered, the lack of evidence to sustain the action must be so clear that it admits no room for fair and reasonable disagreement. A compulsory non[-]suit can only be granted in cases where it is clear that a cause of action has not been established and the plaintiff must be given the benefit of all favorable evidence, resolving any conflict in the evidence in favor of the plaintiff. The fact-finder, however, cannot be permitted to reach a decision on the basis of speculation or conjecture.

*Joyce v. Boulevard Physical Therapy and Rehabilitation Center*, 694 A.2d 648, 652-53 (Pa. Super. 1997).

To succeed on a negligence claim, a plaintiff is burdened with demonstrating each of the following: "(1) a duty or obligation recognized by law; (2) a breach of that duty; (3) a causal connection between the conduct and the resulting injury; and (4) actual damages." *Grossman v. Barke*, 868 A.2d 561, 566 (Pa. Super. 2005) (citations and quotations omitted). Our Supreme Court has further explained:

The plaintiff proves the duty and breach elements by showing that the defendant's act or omission fell below the standard of care and, therefore, increased the risk of harm to the plaintiff. Once the plaintiff has carried this burden, [he] must further demonstrate the causal connection between the breach of a duty of care and the harm alleged: that the increased risk was a substantial factor in bringing about the resultant harm.

*Scampone v. Highland Park Care Center, LLC*, 57 A.3d 582, 596 (Pa. 2012).

Green first argues that he was not required to present expert testimony to establish a standard of care and deviation therefrom with regard to the G Street Terminal fill arm incident. *See* Appellant's Brief, at 13. Specifically, Green contends that expert witness testimony was not necessary because he

raised an ordinary negligence claim and the issues, that the fill arm was too heavy and was a substantial cause of his injury, were easily understood by, and not beyond the knowledge of, the average juror. *Id.* at 15-17. Green also contends that the trial court erred in sustaining Palfrey's relevance objections regarding witness' comparisons to other fill arms. *Id.* at 20. Green is afforded no relief.

> It is well-established that expert opinion testimony is proper [] where formation of an opinion on a subject requires knowledge, information, or skill beyond what is possessed by the ordinary juror. In negligence actions, expert testimony is not required where the matter under investigation is so simple, and the lack of skill or want of care so obvious, as to be within the range of the ordinary experience and comprehension of even nonprofessional persons.

*Ovitsky v. Capital City Economic Development Corp.*, 846 A.2d 124, 126 (Pa. Super. 2004) (no expert testimony needed where jury tasked with determining whether inn's security measures were reasonable; staying in hotels is common and jury can use common sense notions of safety and security).

Green relies on *Marling v. Com. Dept. of Trans.*, 468 A.2d 895 (Pa. Cmwlth. 1983), for the proposition that expert testimony was not required.[5] In *Marling*, our sister appellate Court determined that expert testimony was not needed to prove whether the Pennsylvania Department of Transportation

---

[5] Commonwealth Court cases, while not binding on this Court, may be cited as persuasive authority. *See Commonwealth v. Hunt*, 220 A.3d 582, 590 n.6 (Pa. Super. 2019) (Commonwealth Court decisions provide persuasive authority; our Court not bound by Commonwealth Court decisions).

was negligent in the maintenance and repair of a state highway. There, the plaintiff, to avoid colliding with a disabled truck blocking his lane of travel, drove onto the berm of the road. The berm gave way and plaintiff's vehicle tumbled into a ditch. *Id.* at 896. Lay witnesses testified regarding the condition of the highway at the time of the accident. Specifically, they stated that the guardrails were down and the berm was deteriorated. Photographs of the accident site were introduced into evidence. *Id.* The Commonwealth Court concluded that lay witness testimony was sufficient, reasoning that "worn shoulders and collapsed guardrails are not strangers to users of the public roads and jurors are perfectly capable of drawing conclusions from such conditions." *Id.*

Conversely, in ***Brandon v. Ryder Truck Rental, Inc.***, 34 A.3d 104 (Pa. Super. 2011), this Court determined that expert testimony was required to determine whether a truck rental company had been negligent in failing to uncover a steering mechanism defect in one of its vehicles. There, the plaintiff's only evidence of negligence was that as plaintiff was driving, the vehicle "pulled to the right." *Id.* at 110. This Court reasoned that none of the following questions was within the range of ordinary knowledge or experience of the average lay person: whether the defect was latent or discoverable with reasonable inspection; whether the defect was discoverable in advance of the accident; and whether it was a design or manufacturing defect. *Id.*

Instantly, unlike in **Marling**, where the Court determined that jurors are perfectly capable of understanding the issue of dilapidated roads, fuel fill arms are complicated pieces of machinery, and an average juror is not likely to possess personal or general knowledge of how they operate. **See** N.T. Testimony, 4/19/22, at 58 (Green's attorney, Anthony Cianfrani, Esquire, requesting Green "slow-down" while explaining how to load fuel at terminal because "most people are not [familiar with the process]"). Although we agree with Green that an average person is able to determine if something is "heavy," this subjective inquiry would nevertheless leave the jury to speculate whether Appellees' acts or omissions caused the fill arm to be too heavy for safe lifting.[6]

Without expert testimony, the jury was left without evidence to answer the following questions: the standard of care for the setup, inspection and/or maintenance of fill arms; whether employees or business invitees were provided proper warning regarding use of the fill arm; whether there was design or manufacturing defect in the fill arm; and the maximum weight for a fill arm (and if it is above 60 pounds, the amount of weight Green's job description included). These issues require expert testimony because the proper maintenance, design, and inspection of a fuel fill arm is not within the

---

[6] We note that Green did not claim *res ipsa loquitur*, which would allow for an inference of negligence from the surrounding circumstances. **See Quinby v. Plumsteadville Family Practice, Inc.**, 907 A.2d 1061, 1071 n.15 (Pa. 2005) (referring to *res ipsa loquitur* as "raising an inference of negligence").

ordinary knowledge or experience of the average lay person. *Cf. Ryder Truck Rental*, *supra*.

In light of the foregoing, the trial court did not err in its determination that expert testimony regarding the standard of care and deviation therefrom was necessary. Thus, Green failed to establish a cause of action in negligence and the court properly granted a non-suit. *Joyce*, *supra*; *Ryder Truck Rental*; *supra*.

Further, Green's claim that the trial court erred in sustaining defense objections to the comparison of the G Street fill arms to other fill arms, *see* Appellant's Brief, at 19, also affords Green no relief.

Our scope of review of a trial court's admission of evidence is well-settled.

> We must acknowledge that decisions on admissibility are within the sound discretion of the trial court and will not be overturned absent an abuse of discretion or misapplication of law. In addition, for a ruling on evidence to constitute reversible error, it must have been **harmful or prejudicial** to the complaining party.

*Lykes v. Yates*, 77 A.3d 27, 32 (Pa. Super. 2013) (emphasis added). Additionally, evidence that is not relevant is not admissible. Pa.R.E. 402. Relevant evidence is evidence that "[has] a tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable." Pa.R.E. 401. Relevant evidence may be excluded if its probative value is outweighed by, *inter alia*, the danger of unfair prejudice, confusion or waste of time. Pa.R.E. 403.

Although we agree that this testimony would be relevant to a determination of whether the G Street Terminal fill arm was too heavy for safe lifting, Green mischaracterizes the issue. The relevant inquiry regarding standard of care and breach requires evidence showing the steps that Appellees should have taken, but did not, to ensure safe use of the fill arms. Accordingly, any error here was harmless. *Lykes*, *supra*.

Because all prongs of the negligence test must be met to succeed on a claim, we need not reach the merits of Green's second issue regarding proof of causation.[7] *See Grossman*, *supra*.

_____

[7] Green also claims that he, through Dr. Zamarin's testimony, proved causation. Green alleges that Dr. Zamarin's opinion regarding causation was sufficient where he determined, to a reasonable degree of medical certainty, that Green's partial rotator cuff injury was due to a September 19, 2018 work-related injury. Green argues that regardless of the date the jury occurred— either September 19, 2018, September 15, 2018 or a week earlier—Dr. Zamarian was clear that the injury occurred at work. *See* Appellant's Brief, at 24. Green's claim is belied by the record.

Doctor Zamarin clearly stated that when writing his report, he was unaware of Green's September 15, 2018 hospital visit, four days prior to the instant incident. N.T. Deposition of Richard Zamarin, M.D., 4/14/22, at 20, 25, 30. Upon learning of this information, Dr. Zamarin conceded that his determination regarding causation would change depending on where Green was injured. Additionally, Dr. Zamarin did not challenge Appellees' claim that Green was injured as of his September 14, 2018 hospital visit. Further, the September 15, 2018 Roxborough Memorial Hospital report did **not state where the heavy lifting occurred**. *See id.* at 45-46. Thus, because he did now know when or where the injury occurred, Dr. Zamarin was unable to determine whether Green's injury occurred at work. Moreover, Dr. Zamarin did not opine that Green's September 19, 2018 injury was due to aggravation of a pre-existing condition.

We conclude that the lack of evidence to sustain the action is so clear that it admits no room for fair and reasonable disagreement. Therefore, the trial court properly entered non-suit.

Judgment affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/23/2023