**Busy Bee Inc. v. Corestates Bank N.A.**

C.P. of Lackawanna County, no. 97 CV 5078.

*Steven M. Coren,* for plaintiffs.
*Joan R. Sheak,* for defendant.

NEALON, *J.,* December 30, 2004—The defendant Bank in this lender liability action has filed a *Frye* motion pursuant to Pa.R.C.P. 207.1, challenging the methodology used by the borrowers' damages experts to compute the financial losses allegedly caused by the Bank's wrongful conduct. Based upon the evidence presented during the *Frye* hearings, the business valuation approaches utilized by the borrowers' experts do not involve novel mathematical principles and, to the contrary, are generally accepted methods in the business valuation field. Therefore, for the reasons set forth below, the Bank's motion to exclude expert testimony will be denied.

## I. PROCEDURAL HISTORY

Certain members of the Levy family who own plaintiffs Busy Bee Inc., Baby Bee Inc., MLL Corp. and JASAMI Inc. t/a Century Shoes Ltd. and Carlton Shoes Ltd. t/a BLS Associates (B. Levy) have sued their former lender, defendant Corestates Bank N.A., successor by merger to the Third National Bank & Trust Co. of Scranton, alleging breach of express and implied contractual duties, breach of fiduciary duty, fraudulent misrepresentation and negligent misrepresentation and seeking to recover compensatory and punitive damages. (See

dkt. entry nos. 1, 12.) After this matter was certified for trial, the Bank filed a series of pretrial motions, including a "Motion for separate trials on liability and damage issues" and a "Motion to exclude expert testimony." (*Id.*, nos. 71, 74-75.) One aspect of the Bank's motion to exclude expert testimony consists of a challenge under Pa.R.C.P. 207.1 and *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), to the business valuation methodology employed by B. Levy's damages experts. (*Id.*, no. 71.)

*Frye* hearings were conducted on May 21, 2004 and August 12, 2004, at which time testimony was received from B. Levy's expert witnesses, Morris Gocial C.P.A., Cr.F.A., and John Mitchell C.P.A., C.V.A., of Gocial Gerstein LLC, and Howard Platt of Financo Inc., and the Bank's experts, Thomas J. Hoberman C.P.A., of Withum, Smith & Brown, and William Henrich C.P.A., of Getzler Henrich & Associates. On August 24, 2004, the Bank's motion to bifurcate was granted and separate trials on liability and damages were scheduled with the understanding that a different jury would decide the issue of damages in the event that a liability verdict was returned in favor of B. Levy. (*Id.*, no. 90.) By order dated August 27, 2004, we denied that portion of the Bank's motion to exclude expert testimony which asserted that B. Levy's experts (a) relied upon facts that were inadmissible under Pa.R.E. 703, (b) were not properly qualified under Pa.R.E. 702, and (c) offered opinions on ultimate issues in contravention of Pa.R.E. 704. With respect to the Bank's *Frye* motion contesting the methodology used by B. Levy's damages experts, we deferred any ruling until the damages phase of the trial. (*Id.*, no. 91.)

A liability trial was conducted from September 13, 2004 through September 30, 2004, at the conclusion of which the jury found that the Bank breached contractual and fiduciary duties and committed fraudulent and negligent misrepresentations which were the legal cause of harm to B. Levy. In response to special verdict interrogatories, the jury also found that the Bank's tortious conduct was outrageous so as to entitle B. Levy to recover punitive damages. (*Id.,* no. 110.) Following the completion of an unsuccessful settlement conference on November 18, 2004, the damages trial was scheduled for May 9, 2005, such that the Bank's *Frye* motion is ripe for disposition. (*Id.,* nos. 118, 126.)

## II. FACTUAL BACKGROUND

The details of B. Levy's claims against the Bank were chronicled earlier in *Busy Bee Inc. v. Corestates Bank N.A.,* 67 D.&C.4th 496 (Lacka. Cty. 2004), in which the Bank's motion for partial summary judgment was denied. For purposes of the instant motion under Rule 207.1, the following facts are worthy of note. From 1888 through 1997, B. Levy operated wholesale and retail shoe businesses which had survived numerous industry cycles and economic challenges presented by two World Wars, the Depression, and various recessions. Beginning in 1994, the Bank and B. Levy established a lender-borrower relationship by virtue of which the Bank provided letters of credit and a revolving line of credit for B. Levy's working capital, acquisition of inventory, and general corporate purposes. *Id.* at 499-500.

B. Levy's retail division began to experience financial difficulties due to poor market conditions in the

mid-1990s, as a result of which B. Levy made a strategic decision to convert certain retail stores to discount stores in order to increase revenues, reduce expenses and improve profitability. With the Bank's approval, B. Levy converted two of its 17 retail stores to discount "Brands for Less" outlets in August 1995, and by October 1995, the conversion strategy had proven to be a "strong success" as evidenced by increased sales and corresponding reductions in expenses at the pilot discount stores. After the Bank expressed its continuing support for this conversion strategy, B. Levy agreed in November 1995 to convert four more retail stores to a discount format. As part of its turnaround action plan, B. Levy intended to convert its remaining retail stores to discount operations between 1996 and 2001. *Id.* at 501-502.

However, during a subsequent meeting on December 22, 1995, the Bank informed B. Levy that it no longer endorsed the new discount store concept and instead demanded that B. Levy immediately "get out of the retail business" since the Bank's economist had concluded "that there would be a continuous downturn in the retail environment." *Id.* at 502-503. The Bank also advised B. Levy that it would continue to provide financing for B. Levy's profitable wholesale operations only if it terminated its retail business. As a result, B. Levy's principals reluctantly agreed to liquidate the Levy family's long-standing retail business. Unbeknownst to B. Levy at that time, the Bank's internal memoranda reflected that the Bank actually intended to terminate B. Levy's line of credit prior to its scheduled expiration date of May 31, 1996. *Id.* at 503-504.

In response to the Bank's demand, B. Levy took affirmative steps to liquidate its retail business by hiring a liquidation consultant who had been recommended by the Bank, prematurely terminating several leases for its retail stores, canceling retail merchandise orders that had been placed with its retail stores' suppliers, arranging a private liquidation sale for its preferential customers, and informing more than 100 of its retail store employees of their need to secure other employment. *Id.* at 506-507. On February 29, 1996, the Bank declared B. Levy in default of its financing agreement based upon B. Levy's "plan to liquidate [its] retail operations," which action B. Levy had undertaken at the Bank's insistence on December 22, 1995. When the stunned principals of B. Levy inquired whether the Bank "wanted B. Levy to turn the retail liquidation around and go back to B. Levy's original [discount store] plans," the Bank "said no." Furthermore, after its declaration of default on February 29, 1996, the Bank declined to provide letters of credit or financing for B. Levy's wholesale division, thereby preventing B. Levy's wholesale business from purchasing shoes from its foreign suppliers. As a consequence, B. Levy was forced to file a voluntary bankruptcy petition on July 25, 1996, which the Bankruptcy Court later dismissed on April 9, 1997. *Id.* at 507-509.

During the *Frye* hearings, B. Levy's valuation experts testified that they utilized a combination of the income approach and the market value approach in determining B. Levy's damages. Under this two-step process, the experts calculated what B. Levy's earnings or revenues would have been from 1996 to 2001 if B. Levy had been permitted to implement its business turnaround plan of converting its retail stores to discount stores. At the con-

clusion of that conversion process, B. Levy's operations and revenue stream ostensibly would have stabilized and more accurately represented its projected future earnings. Using 2001 as B. Levy's stabilization point, B. Levy's experts calculated the business' terminal or residual value, *i.e.,* what a prospective buyer would pay to purchase B. Levy and acquire the right to receive its future earnings or revenues. B. Levy's business valuation experts added the projected lost earnings from 1996 to 2001 and the business' terminal or fair market value as of 2001 to arrive at an aggregate figure for B. Levy's pecuniary losses. (See transcript of proceedings on 5/21/04, pp. 15-16, 22-23, 27-30, 39, 51-52, 56-57.)

B. Levy's experts submit that their hybrid approach is appropriate when attempting to fix a value for a business which is in a "state of flux" or an otherwise "fluid situation" as B. Levy was in 1995-1996. In that event, the business' current earnings and operations are not valid or reliable predictors of the business' future revenue stream since the business model is undergoing change and will ultimately yield different earnings. According to B. Levy's experts, the business' stabilized income must first be determined in order to compute an accurate terminal or residual value for the business. Their projected earnings for 1996-2001 are based, in part, upon the historical sales and expense figures from B. Levy's retail to discount conversion success in 1995. (*Id.,* pp. 31-32.)

Morris Gocial C.P.A., Cr.F.A., and John E. Mitchell C.P.A., C.V.A., of Gocial Gernstein LLC, and Howard Platt, of Financo Inc., attested that the foregoing approach does not involve novel valuation principles and, to the

contrary, is a generally accepted method of valuing privately owned wholesale and retail shoe businesses. (*Id.,* pp. 12-13, 26-27, 54-55.) Mr. Gocial and Mr. Mitchell further testified that their methodology is recognized by the Internal Revenue Service Revenue Ruling 59-60, 1959-1, C.B. 237, and authoritative treatises on business valuations, including Trugman, *Understanding Business Valuations: A Practical Guide to Valuing Small to Medium-Sized Businesses* (2nd ed. 2002), Pratt et al., *Valuing a Business: The Analysis and Appraisal of Closely Held Companies* (4th ed. 2000), and Practitioners Publishing Co. (PPC), *Guide to Business Valuations* (8th ed. 2003). (*Id.,* pp. 17-20, 28.)

The Bank's valuation experts contend that lost profits or earnings are an inappropriate consideration for the valuation of a destroyed, as opposed to an impaired, business. Thomas J. Hoberman C.P.A., opined that a lost profits or earnings calculation is acceptable only when assessing damages suffered by an impaired, but still operational, business. Mr. Hoberman asserts that, in those instances in which the business has been destroyed, the fair market value approach is the sole method for ascertaining damages by calculating the present discounted value of the future earnings of the destroyed business. (*Id.,* pp. 64-65, 76.) Since B. Levy's wholesale and retail shoe businesses were allegedly destroyed by the Bank's wrongful conduct, Mr. Hoberman submits that the methodology applied by B. Levy's experts is not generally accepted in the business valuation field as a recognized approach for determining B. Levy's damages in this case. (*Id.,* pp. 65, 71-78.)

The Bank's other expert, William Henrich C.P.A., of Getzler Henrich & Associates, similarly believes that the

valuation principles applied by B. Levy's experts are not generally accepted valuation methods for financially distressed businesses such as B. Levy. (T.P. 8/12/04, pp. 21-23.) Mr. Henrich asserts that a closely-held, distressed business of B. Levy's size may be valued pursuant to either (a) the comparable transaction method or (b) the asset value method. Under the former approach, the valuation is predicated upon the sale prices of comparable companies if such data exists whereas the latter method is based upon the fair market value of the company's tangible assets. (*Id.,* pp. 13-16.) With the asset value method, the only tangible assets which are considered to have value for a distressed company are its accounts receivable and existing inventory since a distressed company generally does not have a positive revenue stream. (*Id.,* pp. 21-22, 26.) Mr. Henrich posits that the asset value method is the only acceptable approach for calculating B. Levy's losses.[1] (*Id.,* p. 26.)

The Bank's *Frye* challenge to B. Levy's valuation methodology is largely premised upon the following passage from section 303.82 of chapter 3 of the PPC Guide entitled "Lost profits analyses" which states:

"303.82. *Destruction of a business.* The calculations in steps 7 [Lost profits computation], 8 [Discount the projected lost profits], and 9 [Calculate prejudgment in-

---

1. In contrast, Mr. Mitchell testified that the asset value method is only appropriate "for businesses that do not sell products or provide services" and is customarily "used for a business that is capital intensive or asset intensive," such as "a real estate holding company." (T.P. 5/21/04, p. 33.) Although the Bank's experts criticize the methodology used by B. Levy's experts, neither of the Bank's experts actually computed B. Levy's damages under their own proffered approaches. (*Id.,* pp. 57-58, 60.)

terest] assume that the closely-held business has been injured or temporarily impaired. However, if the business has been completely destroyed, *most courts* have ruled that the proper measure of damages is the market value of the business on the day of the loss. The theory behind this rule is that the plaintiff who recovers damages equal to the value of the business has, in effect, sold the business to the defendant. The plaintiff should not also be able to recover future lost profits after the imputed sale. Business valuations are discussed in chapter 10 of this guide. In addition, PPC has a three-volume guide titled *PPC's Guide to Business Valuation* to help the expert faced with destroyed businesses." (Corestates exhibit no. 9, pp. 3-27.) (emphasis added) (See also, T.P. 5/21/04, pp. 23-24.)

Comparable language is contained in the Trugman text which B. Levy's experts recognize as an authoritative treatise. (T.P. 5/21/04, pp. 37-38.) The Bank submits that the valuation approach employed by B. Levy's experts provides for the dual recovery of future lost profits and the fair market value of the business in contravention of the above-quoted authorities. (*Id.,* pp. 64-65, 76; T.P. 8/12/04, pp. 18, 21.)

B. Levy's experts testified that they did not provide for the recovery of "future lost profits after the imputed sale" of the destroyed business. Rather, since B. Levy was undergoing a business conversion at the time of the Bank's fraud and wrongful conduct, its experts simply determined its anticipated future revenues once its business operations had been stabilized as per its conversion plan and thereafter calculated the present value of the expected future benefits of ownership of that stabilized business (*i.e.,* its terminal or fair market value). (T.P. 5/

21/04, pp. 38-41.) Even the Bank's own expert, Mr. Hoberman, acknowledged that if the business' past or current earnings are not reliable indicators of the business' anticipated revenue stream in the future, it is appropriate to prepare and use reasonable projections of future earnings in determining the terminal value of the company. (*Id.*, pp. 92-93.) Additionally, Mr. Gocial testified that his firm, Gocial Gerstein LLC, has "used this method several times" when valuing a fluid business, as this approach is "[a]bsolutely" accepted in the business valuation field. (*Id.*, p. 12.)

IRS Revenue Ruling 59-60 addresses the valuation of closely-held companies such as B. Levy and supports the use of more flexible approaches which are tailored to the business' specific circumstances rather than the application of a hard and fast rule. The Revenue Ruling states that "all other available financial data, as well as all relevant factors affecting the fair market value must be considered" and that "[n]o general formula may be given that is applicable to the many different valuation situations arising in the valuation of such stock." (Corestates exhibit no. 7, p. 1.) Section 3 likewise provides that "[a] determination of fair market value, being a question of fact, will depend upon the circumstances in each case" and that "[n]o formula can be devised that will be generally applicable to the multitude of different valuation issues . . . ." *(Id.)* This same section cautions that the business appraiser "should maintain a reasonable attitude in recognition of the fact that valuation is not an exact science" and "is, in essence, a prophecy as to the future and must be based on facts available at the required date of appraisal." (*Id.*, pp. 1-2.) (See also, T.P. 8/12/04, pp. 37-39.)

Under the heading "Factors to consider," section 4 of the Revenue Ruling identifies various factors that "are fundamental and require careful analysis in each case," including "[t]he nature of the business and the history of the enterprise from its inception," "the condition and outlook of the specific industry in particular," "[t]he earning capacity of the company," and "[w]hether or not the enterprise has goodwill or other intangible value." (Corestates exhibit no. 7, p. 2; T.P. 8/12/04, pp. 39-41, 44, 53, 58-59.) Section 4.02(a) instructs that "[t]he history of a corporate enterprise will show its past stability or instability, its growth or lack of growth, the diversity or lack of diversity of its operations, and other facts needed to form an opinion of the degree of risk involved in the business." This subsection also addresses the valuation of a business which has undergone a change in operations and states:

"For an enterprise which changed its form of organization but carried on the same or closely similar operations of its predecessor, the history of the former enterprise should be considered. . . . Events of the past that are unlikely to recur in the future should be discounted, since value has a close relation to future expectancy." (Corestates exhibit no. 7, pp. 2-3; T.P. 8/12/04, p. 62.)

With regard to the business' earning capacity, section 4.02(d) advises that "[p]otential future income is a major factor in many valuations of closely-held stocks, and all information concerning past income which will be helpful in predicting the future should be secured." (Corestates exhibit no. 7, p. 4.) Section 4.02(f) discusses consideration of the business' good will and notes that "[w]hile the element of good will may be based prima-

rily on earnings, such factors as the prestige and renown of the business, the ownership of a trade or brand name, and a record of successful operation over a prolonged period in a particular locality, also may furnish support for the inclusion of intangible value." (*Id.,* p. 4.)

Sections 5 and 6 of IRS Revenue Ruling 59-60 address the "Weight to be accorded various factors" and "Capitalization rates" to be applied in valuing a closely-held company. Section 5 cautions that "[d]epending upon the circumstances in each case, certain factors may carry more weight than others because of the nature of the company's business." (*Id.,* p. 5.) As Mr. Mitchell has testified, the business' projected future earnings "may be the most important criterion of value" when attempting to conduct a valuation "of companies which sell products or services to the public." (*Id.*) Conversely, section 5(b) recommends the asset value approach advocated by Mr. Henrich whenever an appraiser seeks to value "a closely-held investment or real estate holding company." (*Id.*) As to the appropriate capitalization rates, section 6 warns that "the ratio will fluctuate from year to year depending upon economic conditions" such that "no standard tables of capitalization rates applicable to closely-held corporations can be formulated." (*Id.*) For that reason, section 6 urges consideration of, inter alia, "the stability or irregularity of earnings" for the business. (*Id.*)

Finally, section 7, "Average of factors," contains the following admonition:

"Because valuations cannot be made on the basis of a prescribed formula, there is no means whereby the various applicable factors in a particular case can be assigned mathematical weights in deriving the fair market value.

For this reason, no useful purpose is served by taking an average of several factors . . . and basing the valuation on the result. Such a process excludes active consideration of other pertinent factors, and the end result cannot be supported by a realistic application of the significant facts in the case except by mere chance." (*Id.,* pp. 5-6.)

The Bank's expert, Mr. Henrich, acknowledged that the business valuation field evolved as a result of IRS Revenue Ruling 59-60 (T.P. 8/12/04, p. 37), and he described its valuation guidelines as "motherhood and apple pie" in that particular field. (*Id.* p. 39.) Based upon this evidentiary record, the merits of the Bank's Rule 207.1 motion will be considered.

### III. DISCUSSION

#### (A) *Standard of Review*

The "general acceptance" rule for the admission of novel scientific evidence was first established in *Frye* more than 80 years ago and remains the governing standard in Pennsylvania. See *Grady v. Frito-Lay Inc.,* 576 Pa. 546, 839 A.2d 1038, 1044-45 (2003). See also, Pa.R.C.P. 207.1 (prescribing the procedures for seeking "to exclude expert testimony which relies upon novel scientific evidence, on the basis that it is inadmissible under Pa.R.E. 702 or 703 . . . ."). Under *Frye* and Rule 207.1, the proponent of novel scientific evidence bears the burden of demonstrating that the methodology used by that party's expert is generally accepted by the relevant scientific community before the evidence will be admitted in a court of law. *Commonwealth v. Delbridge,* 580 Pa. 68, 859 A.2d 1254, 1260 and n.4 (2004); *Grady,*

839 A.2d at 1045. As an exclusionary rule of evidence, the *Frye* test "must be construed narrowly so as not to impede admissibility of evidence that will aid the trier of fact in the search for truth." *Trach v. Fellin,* 817 A.2d 1102, 1104 (Pa. Super. 2003) (en banc), *appeal denied,* 577 Pa. 725, 847 A.2d 1288 (2004). The trial court's ruling under Pa.R.C.P. 207.1 "should not be disturbed on appeal unless the trial court abuses its discretion" which "may not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill will, or such lack of support so as to be clearly erroneous." *Grady,* 839 A.2d at 1046.

## (B) *Novelty of Methodology*

The Bank contends that the methodology used by B. Levy's damages experts is not generally accepted by the business valuation community. Although *Frye* challenges arise most frequently in medical malpractice, see *e.g., Cummins v. Rosa,* 846 A.2d 148 (Pa. Super. 2004), product liability, see *e.g., Stecher v. Ford Motor Co.,* 779 A.2d 491 (Pa. Super. 2001), and toxic tort litigation, see *e.g., Ford ex rel. Pringle v. Philadelphia Housing Authority,* 848 A.2d 1038 (Pa. Commw. 2004), the Superior Court of Pennsylvania has reasoned that damage valuations in commercial disputes involve the science of mathematics and, as such, are subject to the "general acceptance" standard. See *Reading Radio Inc. v. Fink,* 833 A.2d 199, 208 (Pa. Super. 2003), *appeal denied,* 577 Pa. 723, 847 A.2d 1287 (2004) ("Valuation is mathematical and, in that sense, scientific, yet the methodologies used by [plaintiff's expert] in this case (market analysis and perfor-

mance analysis) were not novel, and appellants failed to produce evidence that they were novel."). Courts must remain mindful, nevertheless, "that a *Frye* analysis is not triggered every time science enters the courtroom . . . ." *Commonwealth v. Dengler,* 843 A.2d 1241, 1243 (Pa. Super. 2004), *appeal granted,* 578 Pa. 715, 854 A.2d 967 (2004). If courts were obligated to apply *Frye* every time that an expert rendered a scientific opinion, it would produce "a result that is nothing short of Kafkaesque to contemplate." *Ford,* 848 A.2d at 1054; *Trach,* 817 A.2d at 1110.

The "general acceptance" exclusionary rule of evidence "applies only when a party wishes to introduce *novel scientific evidence obtained from the conclusions of an expert scientific witness." Cummins,* 846 A.2d at 150 (emphasis in original); *M.C.M. by M.G.M. & C.W. v. Milton S. Hershey Medical Center of PA State University,* 834 A.2d 1155, 1158 (Pa. Super. 2003). Thus, a threshold determination must first be made as to whether the scientific evidence at issue is, in fact, novel. *Delbridge,* 859 A.2d at 1260 ("*Frye* only applies to novel scientific evidence."). To be deemed "novel," the scientific evidence "must be something different from 'new,' which could be original, striking, unusual or strange." *Dengler, supra* at 1243 (expert psychologist's opinion whether sex offender met criteria for sexually violent predator was not novel scientific evidence subject to *Frye*); *Campbell-Perfilio v. PennDOT,* 67 D.&C.4th 31, 43-44 (Lacka. Cty. 2004). More importantly, only the principles and methodology that the expert employs, as opposed to the conclusions [s]he reaches, must be generally accepted by scientists in the relevant field. *Grady,* 839 A.2d at 1045; *Trach,* 817 A.2d at 1114.

In determining whether a particular scientific process or methodology is generally accepted, the court must consider whether the proffered evidence stems from scientific research which has been conducted in a fashion that is "generally recognized as being sound" rather than "the fanciful creation of a renegade researcher." *M.C.M.*, 834 A.2d at 1158-59; *Tucker v. Community Medical Center,* 833 A.2d 217, 224 (Pa. Super 2003). However, the *Frye* test does not "require an optimal methodology, just an accepted one." *Cassell v. Lancaster Mennonite Conference,* 834 A.2d 1185, 1190 (Pa. Super. 2003), *appeal granted in part,* 578 Pa. 428, 853 A.2d 1009 (2004); *Campbell-Perfilio,* 67 D.&C.4th at 44. While authoritative literature may demonstrate that the expert's methodology is generally accepted, properly qualified experts may simply rely upon their individual professional experiences in conducting their analyses and formulating opinions without running afoul of *Frye.* See *e.g., Tucker,* 833 A.2d at 224 (expert's opinion that catheter could not perforate urethral wall was based upon his urological experience and not subject to *Frye*); *Smith v. Grab,* 705 A.2d 894, 900-901 (Pa. Super. 1997) (expert permitted to express opinion regarding effect of three-week delay in diagnosing breast cancer, and the "failure to cite an article or text on point goes to the weight of his testimony, not its admissibility."); *Joyce v. Boulevard Physical Therapy and Rehabilitation Center,* 694 A.2d 648, 656 (Pa. Super. 1997), *appeal denied,* 559 Pa. 771, 740 A.2d 1148 (1999) (expert's opinion was based upon professional experience and it was unnecessary to "cite to treatises and medical periodicals to support his articulation of the standard of care.").

The Bank argues that the valuation approach utilized by B. Levy's experts represents novel mathematical principles which are not generally accepted in the field of business valuation. Under Pennsylvania law, a victim of fraudulent misrepresentation "is entitled to all pecuniary losses which result as a consequence" of the plaintiff's reliance upon the defendant's representations. *Lokay v. Lehigh Valley Cooperative Farmers Inc.,* 342 Pa. Super. 89, 99, 492 A.2d 405, 410 (1985). Such damages "need not be proved with mathematical certainty, but only with reasonable certainty, and evidence of damages may consist of probabilities and inferences." *Hawthorne v. Dravo Corp., Keystone Division,* 352 Pa. Super. 359, 376, 508 A.2d 298, 307 (1986), *appeal denied,* 514 Pa. 617, 521 A.2d 932 (1987); *Delahanty v. First Pennsylvania Bank N.A.,* 318 Pa. Super. 90, 119, 464 A.2d 1243, 1257 (1983). "Thus, the law does not demand that the estimation of damages be completely free of all elements of speculation[,]" *Delahanty,* 318 Pa. Super. at 118, 464 A.2d at 1257, and the fact-finder "may use a measure of speculation in estimating damages." *Penn Electric Supply Co. Inc. v. Billows Electric Supply Co. Inc.,* 364 Pa. Super. 544, 549, 528 A.2d 643, 645 (1987). Any doubt or uncertainty as to the precise amount of damages is construed against the breaching party or wrongdoer. *Atacs Corp. v. Trans World Communications Inc.,* 155 F.3d 659, 669 (3d Cir. 1998) (citing *Delahanty* and applying Pennsylvania law).

Relying upon IRS Revenue Ruling 59-60 and appendix 10C of the PPC Guide, B. Levy's experts submit that it was appropriate for them to add B. Levy's projected revenues under its anticipated conversion plan and the

fair market value of its stabilized operations in order to calculate its pecuniary losses with reasonable certainty. The Bank's *Frye* challenge to that methodology is based upon the above-quoted language from Trugman and the PPC Guide, to wit, that when calculating damages for a business that "has been completely destroyed, most courts have ruled that the proper measure of damages is the market value of the business on the day of the loss" and that "[t]he plaintiff should not also be able to recover future lost profits after the imputed sale." However, Pennsylvania does not appear to be aligned with that majority position and the Bank has not cited any decisional precedent which recognizes that standard as the controlling measure of damages in this Commonwealth. On the contrary, both the federal and state appellate courts have held that "[i]t is well settled that lost income or profit is recoverable in an action for the destruction or interruption of an established business, whenever they are not merely speculative or conjectural." *Princeton Sportswear Corp. v. H & M Associates,* 358 Pa. Super. 325, 333, 517 A.2d 963, 967-68 (1986), *appeal denied,* 517 Pa. 608, 536 A.2d 1332 (1987); *Delahanty,* 318 Pa. Super. at 126, 464 A.2d at 1261; *Rea v. Ford Motor Co.,* 560 F.2d 554, 557 (3d Cir. 1977), *cert. denied,* 434 U.S. 923, 98 S.Ct. 401, 54 L.Ed.2d 281.

The projected earnings calculations prepared by B. Levy's experts are based upon historical sales data from those stores which had been successfully converted to discount outlets and are not the product of sheer speculation or conjecture. Furthermore, the experts did not include recovery for lost profits "after the imputed sale" in 2001. Instead, they merely calculated lost profits *before* the imputed sale in 2001 which was hypothetically

conducted after the stabilization of B. Levy's revenue stream following the consummation of its original conversion plan. The hybrid valuation method used by B. Levy's experts considered B. Levy's history of resilience, the changing nature of its operations, and the particular circumstances of its family-owned business. Such a valuation approach is not contrary to the flexible guidelines set forth in IRS Revenue Ruling 59-60 or the relevant literature.

Based upon the foregoing, it is apparent that the valuation methodology used by B. Levy's experts does not involve novel scientific evidence. See *Reading Radio Inc.,* 833 A.2d at 208. *Frye* and Rule 207.1 do not "require an optimal methodology, just an accepted one," and the materials submitted by the parties reflect that B. Levy's experts have utilized approaches and principles which are generally accepted in the field of business valuation. Any criticisms that the Bank may have with respect to those methodologies may be legitimate fodder for cross-examination, but do not warrant exclusion of the evidence in its entirety. As we have previously noted:

"Simply because the defense experts disagree with the scientific theories proffered by [plaintiff's] experts does not mean that [their] testimony is subject to preclusion under Rule 207.1. If expert opinions were declared inadmissible on that basis, trial judges would be transformed from gatekeepers for the introduction or exclusion of novel scientific evidence to fact-finders obligated to choose between conflicting expert opinions and to determine which opinion is more credible or reliable. Determinations of that nature are the sole responsibility of the jury. The defense's criticisms of the foregoing conclusions and [methodology] affect the weight of the tes-

timony by [plaintiff's] experts rather than its admissibility." *Campbell-Perfilio,* 67 D.&C.4th at 48.

Accordingly, the Bank's *Frye* motion will be denied.

ORDER

And now, December 30, 2004, upon consideration of the defendant's motion to exclude expert testimony pursuant to Pa.R.C.P. 207.1, the testimony and exhibits introduced during the evidentiary hearings, the memoranda of law submitted by the parties and the oral argument of counsel, and based upon the reasoning set forth in the foregoing memorandum, it is hereby ordered and decreed that the defendant's motion to exclude expert testimony pursuant to Pa.R.C.P. 207.1 is denied.

